Belknap
No. 7588

### ANGELO J. ASCIOLLA

### v.

### MANTER OLDSMOBILE–PONTIAC, INC.
### AND
### GENERAL MOTORS CORPORATION

January 31, 1977

*Nighswander, Lord, Martin & KillKelley,* of Laconia, and *David S. Osman (Mr. Willard G. Martin, Jr.* orally) for the plaintiff.

*Devine, Millimet, Stahl & Branch,* of Manchester (*Shane Devine* orally) for the defendants.

DOUGLAS, J. This case determines the circumstances under which a new car buyer may revoke his acceptance of a defective vehicle. We hold that the purchaser of a major consumer item such as an automobile may revoke his acceptance of a product when it possesses a defect which, in view of the particular needs and circumstances of the buyer, substantially impairs the value of the item to him.

The action arises out of the sale of a new automobile on December 13, 1972. Trial before a Master (*Mayland H. Morse, Jr.*, Esq.) resulted in a verdict for the plaintiff in the amount of $1,000 against the defendant General Motors Corporation. During the course of the trial the plaintiff seasonably excepted to certain rulings of the master in excluding evidence and in denying requests for various findings of fact and rulings of law. All questions of law raised by the foregoing were reserved and transferred by *Keller*, C.J.

The plaintiff, having previously purchased three cars from the defendant Manter Oldsmobile-Pontiac, Inc., placed a special order in the late fall of 1972 for a 1973 Oldsmobile Delta 88 sedan. The vehicle was manufactured at the General Motors plant in Linden, New Jersey, and delivered to the dealer Manter on December 13, 1972.

Upon receipt by Manter, the car was serviced and treated for rust by the Ziebart process, and then delivered to the plaintiff on December 15, 1972. The automobile was sold to Mr. Asciolla as a new car for a purchase price of $5,209, which was paid in full. The product carried with it the standard express General Motors new car warranties.

The day after delivery the plaintiff and his wife departed for Mequon, Wisconsin, a trip which had been delayed pending arrival of the new car. During the 1,390 mile drive, which lasted for three days, the plaintiff experienced no difficulty with the car except for a noise which was heard about two miles before arrival at his destination and which he described as sounding like a dry speedometer cable.

The vehicle was parked outside during the plaintiff's stay in Wisconsin and received little use upon arrival, although the plaintiff started it up occasionally to warm the motor and keep the battery charged. On the evening of January 10, 1973, following an interval during which the Wisconsin temperature had dropped

below zero, the plaintiff endeavored to start his new car. The vehicle, however, emitted a loud noise which stopped when it was shifted into gear. The car would move neither forward nor backward because the transmission would not respond to the gear lever.

The car was towed to the nearest franchised Oldsmobile dealer, where the transmission was dismantled, the wheels removed, and an underbody inspection made. In the oil pan of the transmission were found deposits of ice, one of which was described to be half the size of a fist. Three inches of water were found in the trunk wells. Considerable rust was found on the brake drums, prop shaft, exhaust pipe and unpainted areas of the underbody. The transmission oil filter was also found to be covered with ice, and the forward clutch of the transmission at the pump hub had a split teflon ring. The plaintiff testified that he was told that the car appeared to have been flooded or submerged. Upon receipt of this information, the plaintiff immediately informed Manter and the Oldsmobile Division of General Motors that he was not satisfied with the car and wanted it exchanged for a new one. The defendants refused to supply a new vehicle, but offered instead either to install a new transmission with a twelve-month warranty after installation or to extend the present warranties twelve months from the date of the repairs to the existing transmission performed by the Wisconsin dealership. The problem of water in the trunk was attributed to a small leak which was repaired. The rust on the underbody parts which were not Ziebart-coated was claimed to be consistent with the general condition of new cars delivered from the New Jersey plant. The defendants maintained, upon inspection of the vehicle, that it had never been flooded.

The plaintiff presently takes the position that his notification of his dissatisfaction to the defendants immediately upon discovery of the defects constituted either a rejection of the automobile, RSA 382–A:2–601(a), :2–508, or, alternatively, a revocation of his acceptance, RSA 382–A:2–608. The master found that the malfunction which caused the transmission to become inoperable constituted a latent defect, which could not reasonably have been discovered by the plaintiff any sooner than it was, and which rendered the chattel unfit for its normal use. He found that the defect was one of "material or workmanship" appearing within a period of twelve months or twelve thousand miles after the purchase of the car, and as such was covered under the General Motors express war-

ranty. He also found that the defect constituted a breach of the manufacturer's implied warranties of fitness and merchantability.

The master further found, however, that no satisfactory evidence was produced that the car had been flooded prior to delivery. He found that the rust present on the underparts of the car had no functional or disabling effect and did not affect the vehicle's marketability or value. He concluded that "[t]he repairs required under [the express] warranty would in normal circumstances and to a reasonable person adequately serve to correct the defect" in the transmission. He accordingly ruled that the plaintiff had no right to reject or revoke his acceptance of the product, but was limited in his remedy to the repairs offered by the defendants, together with consequential damages flowing from the breach of the implied warranty. *See* RSA 382–A:2–314, :2–316.

 We do not concur in the master's conclusion of law that the plaintiff's remedy is properly limited to the recovery of consequential damages. We note at the outset that RSA 382–A:1–106(1) states that "[t]he remedies provided by this chapter shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed. . . ." Bearing this precept in mind, and assuming, without deciding, that acceptance of the automobile by the plaintiff within the meaning of RSA 382–A:2–606 had taken place, we hold that under the facts of this case the plaintiff was entitled to revoke his acceptance. RSA 382–A: 2–608 provides in pertinent part that "[t]he buyer may revoke his acceptance of a [product] whose nonconformity substantially impairs its value to him if he has accepted it . . . without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances. Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it . . . It is not effective until the buyer notifies the seller of it." The question which this section raises for our purposes is whether the inoperable transmission of the plaintiff's car was a defect that substantially impaired the value of the product to him. RSA 382–A:2–608 Comment 2 states that the test of "substantial impairment" is "whether the non-conformity is such as will *in fact* cause a substantial impairment of value *to the buyer*. . . ." (Emphasis added.) This section, therefore,

creates a subjective test in the sense that the needs and circumstances of the particular buyer must be examined. This determination is not, however, made by reference to the buyer's personal belief as to the reduced value of the goods in question. The trier of fact must make an objective determination that the value of the goods to the buyer has in fact been substantially impaired. *Jorgensen v. Pressnall,* 274 Ore. 285, 545 P.2d 1382, 1384–85 (1976); *Tiger Motor Company v. McMurtry,* 284 Ala. 283, 224 So. 2d 638, 646 (1969); *Hays Merchandise v. Dewey,* 78 Wash. 2d 343, 347, 474 P.2d 270, 273 (1970); Note, *Revocation of Acceptance: The Test for Substantial Impairment,* 32 U. Pitt. L. Rev. 439 (1971); J. White and R. Summers, Uniform Commercial Code 260 (1972).

In determining that the plaintiff was not entitled to revoke his acceptance, the master did not apply the test set forth above. Instead he utilized an objective standard, finding that a "reasonable person" would have been satisfied with the repaired car. Without addressing the validity of that conclusion, we find from the record that the value of the subject automobile to *Mr. Asciolla* was substantially impaired. In purchasing a new car the plaintiff was making a major investment. Few items which are considered necessities occupy such a significant portion of an individual consumer's income as does a new automobile. Few purchases are made with more care and deliberation. The record indicates that the plaintiff was a particularly prudent and painstaking car buyer and that he had indeed once before refused to accept an automobile from the defendants which merely had a dented fender which had been repaired. Within three weeks of the purchase of the car at issue in this case he found it to be totally inoperable. He was informed by franchised representatives of the manufacturer that the car had been flooded or submerged. While the master found that the evidence presented at the hearing did not support such a conclusion, no satisfactory reason was ever presented to the plaintiff to otherwise explain the presence of ice in his transmission. Nor was Mr. Asciolla offered any guarantees concerning other deficiencies, caused by the same mysterious condition, which he very reasonably apprehended might arise in the future.

Under these facts, we think it clear that the plaintiff's confidence in the reliability and integrity of his new automobile was severely undermined. He had bargained for a new car, expecting to receive a vehicle upon whose dependability and safety he could

90

comfortably rely. Instead he received a product which he understandably feared was what is known in popular parlance as "a lemon." The plaintiff is correct in his assertion that a new automobile is more than the sum of its various components. It is the integrity of the vehicle as a whole which is the essence of the consumer's bargain. As the Superior Court of New Jersey said in a markedly similar case concerning a new car with a defective transmission, "[the buyer] assumed what every new car buyer has a right to assume and, indeed, has been led to assume by the high powered advertising techniques of the auto industry—that his new car, with the exception of very minor adjustments, would be mechanically new and factory-furnished, operate perfectly, and be free of substantial defects." *Zabriskie Chevrolet, Inc. v. Smith,* 99 N.J. Super. 441, 452, 240 A.2d 195, 201–02 (1968). The plaintiff's situation cannot be accurately compared to cases cited by the defendants such as *Rozmus v. Thompson's Lincoln-Mercury Co.,* 209 Pa. Super. 120, 224 A.2d 782 (1966) and *Grucella v. General Motors Corporation,* 10 Pa. D. &C.2d 65 (1956), in which the cars presented defects which were trivial and readily repaired. The new car in the instant case was rendered wholly inoperable by a defective condition which permeated one of its most essential systems. Under such circumstances, his revocation of acceptance is justified. *Orange Motors of Coral Gables v. Dade Co. Dairies,* 258 So. 2d 319 (Fla. App. 1972); *Tiger Motor Company v. McMurtry,* 284 Ala. 283, 224 So. 2d 638 (1969); *Moore v. Howard Pontiac-American, Inc.,* 492 S.W.2d 227 (Tenn. Ct. App. 1972), *cert. denied,* 492 S.W.2d 227 (Tenn. 1973); *see Nadeau v. Irwin Motors,* 102 N.H. 212, 153 A.2d 791 (1959); *Simpson v. Simmons,* 114 N.H. 690, 693, 327 A.2d 708, 710 (1974) (Kenison, C.J., dissenting).

The defendants contend that they are entitled to cure the nonconformity in the tendered goods. Although a seller is given the right to cure under RSA 382–A:2–508 in the context of rejection of goods, no such right is granted by RSA 382–A:2–608(1)(b) when acceptance is being revoked. Whether a seller's right to cure may be implied under this section has been the subject of considerable dispute. *See* Note, *Uniform Commerical Code—Sales—Sections 2–508 and 2–608—Limitations on the Perfect-Tender Rule,* 69 Mich. L. Rev. 130, 146–47 (1970); 28 Ark. L. Rev. 297, 300–01 (1974). We need not decide the question in this case, however. For the reasons set forth above, any cure other than replacement of the

automobile with a new one would, under the facts of this case, be insufficient to accomplish a conforming tender. *See Zabriskie Chevrolet, Inc. v. Smith supra;* 2 R. Anderson, Uniform Commercial Code § 2–608:10 (2d ed. 1971); 28 Ark. L. Rev. 297 (1974).

*Exceptions sustained; remanded.*

All concurred.