491 So.2d 204 (1986)
Norman L. RESTER
v.
Tommy MORROW, etc., et al.
No. 54971.
Supreme Court of Mississippi.
June 4, 1986.
Rehearing Denied July 30, 1986.
*205 Susan K. Steadman, Eugene L. Fair, Hattiesburg, for appellant.
William A. Weinischke, R.A. Gray, III, Gray, Montague & Pittman, Norman W. Pauli, Jr., James H.C. Thomas, Jr., Hattiesburg, for appellees.
En Banc.
ROBERTSON, Justice, for the Court:

I.
This case presents twin questions regarding the rights of the purchaser and duties of the seller of an automobile which turned out to be a lemon. First, what must the purchaser show before he may revoke his acceptance of the automobile and recover the purchase price? Second, by reference to the standard to be given in answer to the first question, what quantum of proof must the purchaser offer before he has created a jury question on his right to revoke his acceptance?
Norman L. Rester (Rester) appeals from a directed verdict judgment in favor of the defendants Tommy Morrow A.M.C., Inc. (Morrow), Martin Motor Sales (Martin), Mississippi corporations, and American Motor Sales Corp. (AMC), a foreign corporation, in the Circuit Court of Forrest County. Rester had sued these defendants alleging his right under the Mississippi Uniform Commercial Code[1] (UCC) to revoke his acceptance of a demonstrator Renault automobile, and recover the purchase price.
We are of the view that the trial judge erred in holding that Rester failed to make out a jury issue on the question of whether he was entitled to revoke his acceptance and, for the reasons explained below, we reverse and remand.

*206 II.
On April 13, 1981, Rester purchased a demonstrator 1981 model Renault series 18i with 2,915 miles from Morrow in Hattiesburg, paying $8,800 cash. He then financed the car through a local bank. The car carried AMC manufacturer's limited warranty against defects for the first occurring of 12,000 miles or 12 months.
While driving the car preparatory to purchase, a piece of chrome trim about one inch square fell off the windshield in heavy traffic. Rester did not stop to pick it up, and Morrow promised to replace it.
Just after his purchase, Rester drove the car to Florida on vacation, and was gone ten or eleven days. He reported to Morrow the following defects he had found in the car:
(1) When the hazard light (flasher signals) were turned on, the radio also came on.
(2) There was a gasoline odor in the car, noticeable mainly while driving without the air conditioner on. The odor could be detected in the trunk.
(3) When operating the air conditioner leaked heavily on the right side of the car.
(4) The car was equipped with a gauge which indicated the oil level, which Rester called the oil indicator gauge (not to be confused with an oil pressure gauge). This oil indicator gauge was not working.
About two weeks later the car was taken to Morrow's shop for repair. The hazard flasher/radio problem was fixed. The air conditioner started leaking again when Rester got home. Rester's main complaint at that time was Morrow did not replace the piece of chrome or fix the oil indicator gauge.
He telephoned Morrow that the air conditioner had started leaking again, and Morrow told him to bring the car in. After being in the shop the second time, Rester noticed the low speed fan motor of the air conditioner was not working. Morrow told him this was a problem with these cars, and the dealers had been directed by the manufacturer to put a new wiring harness on air conditioners having these problems, but he would have to order the part. When the parts came in and Rester took the car to the shop, he told the mechanic the oil indicator gauge was not working, either, and the mechanic promised to order another gauge.
Rester then changed jobs, and had to drive back and forth from his home in Carriere to New Orleans.
He noticed the air conditioner leaking again. He took the car to Morrow's on a Monday, Morrow told Rester that the mechanic had quit. Rester told Morrow he wanted another oil gauge, and Morrow told him if he could get another mechanic he would do so; otherwise, Rester would have to take the car to another local dealer. Rester did get his car on the following Friday afternoon, and the air conditioner had been fixed. He drove the car from Hattiesburg to his home, and approximately a week later he drove to Baton Rouge to a fire school he was attending. Rester said the air conditioner went out of control while he was attending school in Baton Rouge; when the air conditioner was turned off it still ran. If the heater was turned on, the air conditioner ran instead. Rester said he could still smell gas in the car if the car was running, the windows were down, and the air conditioner was off. He said the air conditioner and gas fumes were a real annoyance, aside from the delay factor.
Rester left Baton Rouge for New Orleans. While in New Orleans late one night, after he had filled the gas tank, Rester drove for some distance with the car running smoothly, and then the lights began to get dimmer and dimmer, the battery progressively weaker. Finally, the car went dead, and Rester had to tow it to a friend's house. Rester telephoned Morrow and told him he wanted his money refunded on the car's purchase. Morrow replied he had sold his agency to Martin.
Morrow told Rester to take the car to a New Orleans dealer, who Rester called, and the car was picked up on a Thursday. *207 On the next day he got his car, and was informed by the shop personnel he had left his wipers on intermediate and run the battery down. They had charged the battery. Rester told them more than simply a dead battery was causing the problems, but was again told there was no electrical problem. Rester paid the agency $49 for towing, checking the electrical system, and charging the battery. He returned home in the car, and a week later drove it back to New Orleans. For the next month he had no problems with the car.
One night after he returned to New Orleans, Rester went to a night club in Metairie, Louisiana. As he was leaving around midnight, the car had no power. There were no lights, it would not crank. Rester telephoned Morrow around 12:30 a.m., who gave him the name of Ron Foshee, the factory representative of AMC, and who lived in Georgia.
Morrow also called Rester later and told him to take the car to a New Orleans dealer. Rester called the same New Orleans dealer who had the car for repair the first time, and was told to get a Metairie dealer, which he did. When he got his car from the Metairie dealer, he was charged $119.00. Part of the charge was for a new battery.
Rester telephoned Foshee and told him what was wrong with the car, that the air conditioner was all messed up. Foshee told him he would order the parts and send them to Martin's. Rester told Foshee he did not want a Martin or Morrow mechanic working on the car, and was promised by Foshee that he would bring the parts to Hattiesburg, and also his own mechanic from Stone Mountain, Georgia, to fix the car.
In September, while he was waiting on his car to be repaired, it stalled twice. Rester also smelled gas fumes. When he drove the car home, he could hear the "battery frying". When he opened the hood, the car was burning the battery up, and Rester thought the alternator was charging too much.
When he later met with Foshee at Martin's in Hattiesburg, Rester reported to Foshee the following problems with the car:
1. The air conditioner was worse than ever.
2. The piece of chrome was still missing.
3. The carpet was bad from water leaking on it.
4. A problem had developed in the rachet adjusting in the passenger seat.
5. Gas fumes could still be detected.
6. The fuse panel had fallen from under the dash.
7. The oil indicator gauge was not working.
8. The stalling problem.
9. The battery smelled like it was burning up.
At one time Morrow had drilled a hole in the gasoline cap, but this still did not stop the odor. They told him to cut some apples and put in the trunk, but this still did not stop the odor.
As for the battery sizzling problem, Foshee informed Rester when he examined the car that the dealer who installed the new battery put in too small a battery. Foshee also told Rester that part of his problem was the close proximity of the battery to the catalytic converter, which would be repaired by simply putting a shield between them, which they would install.
Rester said he was promised the car would be ready for delivery the next afternoon. He also said, "I loved the car as far as performance, the ride was excellent in the car, the handling was excellent, it was just this nick-pick stuff, and the car was not fitting up to the demands of transportation." He said while you could expect a car to quit every now and then, his had stalled twice in a month.[2]
*208 Two days later, Rester inquired by telephone about his car, and was told by the Martin service manager that they had discovered something wrong with the alternator, and had ordered parts from California, which would take about seven days delivery.
Rester told the service manager he needed a car for transportation 300 miles away or he would lose his job. He then called Foshee and told him if they did not fix the car he was going to see a lawyer.
On the following Friday Rester called Martin's who told him they had the parts but could not put them in because they had no mechanic. This was fourteen days after he had delivered the car. Rester called Foshee again, who was apologetic and said he would call back. Foshee did not call back, however.
Rester bought a 1980 model Oldsmobile, paying $4,900 for it. It was needed in order to have transportation to work.
Approximately 21-22 days after his delivery of the car to Martin's, they telephoned Rester's home and left a message the car was ready.
When Rester returned home from his job and learned the car was ready, he drove to Hattiesburg for it. When he got to Martin's and looked at the car, he noticed the fuse panel was still out from under the dash, the carpet was still soiled, and the chrome was still missing. He had at this time also received a recall notice from AMC, about which he testified.
With the fuel odor problem. Not actually the fuel odor problem, but it has a recall notice to the fact stating that you might be driving the car and it would have a problem as though it would run out of gas and it was something about the gasoline was eating up the glue or whatever the line was put together in the fuel line and causing it to stop up or contaminance [contaminants] to get in the gas and causing it to die and it had done this to me on two occasions already and I was told by Tommy Morrow and them that I had just let it run out of gas one of the occasions and on the other occasion I didn't even bring it up.
Rester talked to the service manager about the recall notice, who told Rester he would check it out. Rester then told the service manager he would not need the car that day. He also told the service manager the fuse panel was still hanging, and the chrome was still off, according to Rester, "just a couple of little nick-nack details". Rester then told the service manager to fix these defects and attend to the recall defect, and he would come back and get the car later.
The service manager then told Rester that Foshee had told them not to fix anything else, even the oil indicator gauge.
Rester then testified he got irate, and asked if Foshee had worked on the car with his mechanic. The service manager replied Foshee had not brought anybody. Then Rester got angrier because Foshee not only had not brought a mechanic, but had left it with the same mechanic who never fixed the car in the first place, and without determining whether the repairs had been made. Rester testified as follows:
I said, `Well, if this other yo-yo worked on it and couldn't fix it the first time, there's no way in the world I'll accept the car. He's worked on it this time and he couldn't fix the air conditioner, what's to guarantee him to fix the electrical condition or anything.' So I refused the car... .
Rester made only a visual inspection before rejecting the car, from which he determined the fuse panel had not been replaced, the carpet was still soiled and the chrome was still missing. He never attempted to ascertain if, in fact, the other repairs had been made.
It was some time in September when Rester took the car for the last time to the dealer's in Hattiesburg, some five months after his purchase. He had driven the car some 11,000 miles, and had taken it in for repairs a total of five or six times.
Rester employed an attorney, who wrote Morrow and Martin on November 23, 1981, *209 that the car had proved defective, that the return of the car was intended to be a "recision" of the sales contract, and demanded a return of the purchase price, interest, plus $4,000 in damages.
After Rester had employed counsel, he received a January 26, 1982, notice from AMC which stated the following defect:
American Motors Sales Corporation had determined that a defect which relates to motor vehicle safety exists in some 1981 Renault 18i vehicles. Some of these vehicles may have been assembled with a fuel line that could develop a leak near the engine, resulting in a fuel odor or an underhood engine compartment fire. Should you notice a fuel odor, the vehicle should be stopped and not driven until repaired.
On March 18, 1982, Rester brought suit in the Circuit Court of Forrest County against Morrow, Martin and AMC. His testimony was as above set forth. Also testifying was an employee of the local bank. When Rester rested, the defendants moved for a directed verdict. See Rule 50(a), Miss.R.Civ.P.
The trial judge sustained the motion, primarily because of his view that the only defects Rester noted were not substantial impairments of the value of the car, and that Rester had offered no proof as to the others not being repaired, but had abandoned the car at the dealer's. The trial judge stated that clearly Rester would be entitled to damages of some kind for failure to make the repairs, but was obligated to show the defects remained.
From an adverse final judgment, Rester has appealed to this Court. We reverse and remand.

III.
Norman L. Rester purchased a 1981 Renault on April 13, 1981, and encountered repeated difficulties through and including September 15, 1981, at which time he abandoned the vehicle back to its seller.[3] The ultimate issue is whether the automobile failed to conform to the seller's contractual and legal obligations incident to the sale and whether such nonconformity substantially impaired the value of the automobile to Rester. Miss. Code Ann. § 75-2-608(1) (1972). The resolution of such a question of ultimate fact may be taken from the jury only in conformity with our familiar rule emanating from Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975) and progeny. Because the evidence on the substantial impairment issue is quite disputed, the trial judge committed error when he sustained the seller's motion for directed verdict.
Without question, Rester had accepted the automobile, not necessarily on April 13, 1981, but when he failed to make an effective rejection after having had a reasonable opportunity to inspect it. Miss. Code Ann. § 75-2-606(1)(b) (1972). Rester's acceptance was reasonably induced by the difficulty of discovery of defects before acceptance and by the seller's assurances. Miss. Code Ann. § 75-2-608(1)(b) (1972). Cf. J.L. Teel Company, Inc. v. Houston United Sales, Inc., (Miss. No. 54,448, dec. May 14, 1986) (not yet reported).
Rester then attempted to revoke his acceptance. This revocation occurred when he returned the automobile to the seller on September 15, 1981. The ultimate question, as indicated above, becomes whether on the facts of this case he was entitled to revoke. The outcome determinative question on this appeal is, in the present state of the record, to what decision making authority  the trial judge or the jury  has our law committed the making of the factual determinations whether the Renault "non-conformed" and whether that nonconformity substantially impaired its value to Rester.

*210 IV.
There are two fundamental errors in the trial judge's approach to this case, the first having to do with the UCC conception of substantial impairment and the second, as indicated, having to do with when that issue may be taken from the jury. First, the trial judge seems to have considered that the only bases for rejection are the specific complaints of Rester the day he returned the automobile to his seller. On that occasion Rester pointed out a soiled carpet, an unrepaired fuse panel and an unreplaced piece of chrome. Unquestionably, these are minor defects.
Rester's entitlement to revocation, however, turns upon whether, under the totality of the circumstances  temporally and structurally  the automobile failed to be what the seller was by private and public law obligated to provide Rester and whether that aggregate nonconformity substantially impaired the value of the automobile to Rester. In Accord Zoss v. Royal Chevrolet, Inc., 11 UCCRS 527 (Ind. Super.Ct. 1972). Put another way  and having in mind the testimony in this case, the seller has a right to attempt cure. Cf. Miss. Code Ann. § 75-2-508 (1972). But our law does not allow a seller to postpone revocation in perpetuity by fixing everything that goes wrong with the automobile. There comes a time when enough is enough  when an automobile purchaser, after having to take his car into the shop for repairs an inordinate number of times and experiencing all of the attendant inconvenience, is entitled to say, "That's all," and revoke, notwithstanding the seller's repeated good faith efforts to fix the car. Welch v. Fitzgerald-Hicks Dodge, Inc., 121 N.H. 358, 430 A.2d 144 (1981); Durfee v. Baxter, 262 N.W.2d 349, 354 (Minn. 1977).
The Florida case of Orange Motors of Coral Gables v. Dade County Dairies, 258 So.2d 319 (Fla.App. 1972) made the point this way:
The buyer of an automobile is not bound to permit the seller to tinker with the article, indefinitely in the hope it may ultimately be made to comply with the warranty ... [citations omitted] At some point in time, if major problems continue to plague the automobile, it must become obvious to all people that a particular vehicle simply cannot be repaired or parts replaced so that the same is made free of defect.
258 So.2d at 321.
Among the legion cases to like effect are Seekings v. Jimmy GMC of Tuscon, Inc., 130 Ariz. 596, 638 P.2d 210, 218 (1981); Conte v. Dwan Lincoln-Mercury, Inc., 172 Conn. 112, 374 A.2d 144, 149 (1976); and Tiger Motor Company v. McMurtry, 284 Ala. 283, 224 So.2d 638, 647 (1969).
In this setting it is appropriate to reiterate the aggregate of problems Rester encountered with the automobile:
(1) the presence of the odor of gas fumes;
(2) the problems with the air conditioner which at times bordered on the bizarre;
(3) the stalling problem;
(4) the problems with the battery;
(5) the problems with the oil indicator gauge;
(6) the problems with the fuse panel;
(7) the problems with the ratchet adjustment on the passenger seat;
(8) the problem of the soiled carpet due to water leaking on it;
(9) the missing piece of chrome.
These problems required repeated servicing.
The trial judge  and the seller on this appeal  concentrate only upon the straw said to have broken the camel's back. In our view, the whole camel  including its performance over the five month period Rester's use of the Renault  is relevant to the question of whether Rester had the right to revoke.
For a majority of people the purchase of a new car is a major investment, rationalized in part by the peace of mind that flows from its dependability and safety. Once the purchaser's faith is shaken, the vehicle loses not only its real value in his eyes, but *211 becomes an instrument whose integrity is substantially impaired and whose operation is fraught with apprehension. The attempted cure in the present case was ineffective. Cf. Zabriskie Chevrolet, Inc. v. Smith, 99 N.J. Super. 441, 240 A.2d 195, 205 (1968).
Our law tells a buyer such as Rester that he may revoke only if there is substantial impairment of the value of the car "to him". Miss. Code Ann. § 75-2-608(1) (1972). J.L. Teel Company, Inc. v. Houston United Sales, Inc. (Miss.No. 54,448, dec. May 14, 1986) (not yet reported); Volkswagen of America v. Novak, 418 So.2d 801, 804 (Miss. 1982). Substantial impairment is determined by reference to the particular needs of the buyer, even though the seller may have no advance knowledge of those needs and even though those needs may change after acceptance of the automobile. White & Summers, Uniform Commercial Code, § 8-3, p. 308 (2d ed. 1980). UCC Official Comment 2; but see Douglas Whaley, Tender Acceptance, Rejection and Revocation  The UCC's "Tarr Baby"; 24 Drake L.Rev. 52, 76 (1974)
While the statute imports a subjective standard of nonconformity and impairment, we regard that it nevertheless contains an important objective component. The "to him" language in the statute requires that courts proceed by reference to the unique circumstances of the buyer. Once those circumstances have been determined, we proceed to an objective determination of whether the nonconformity would substantially impair the value of the automobile to a reasonable person in the circumstances of the buyer.[4]
Rester's circumstances are set forth adequately above. They involve considerable regular travel. Those circumstances suggest an unequivocal need for a properly functioning automobile. When one pays for a car what Rester paid for the Renault, he is entitled to frills as well as essentials that are relatively troublefree.

V.
We note the standard which must be employed in determining whether a party is entitled to have a jury pass upon the factual questions in his case. In such a context the trial court  and this Court on appeal  must consider the evidence in the light most favorable to the party opposed to the motion. (That party here, of course, is Rester.) That credible evidence tending to support the non-movant's [Rester's] case must be presumed true. The non-movant must also be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point so overwhelmingly in favor of the movant [the seller here] that reasonable men could not have arrived at a contrary verdict, granting the motion is required. On the other hand, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the motion must be denied and the matter submitted to the jury.
These principles are stated in cases which are legion including, but not limited to, Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975); Stubblefield v. Jesco, Inc., 464 So.2d 47, 54 (Miss. 1984). White v. Hancock Bank, 477 So.2d 265, 268-69 (Miss. 1985); Hardy v. Brantley, 471 So.2d 358, 373-74 (Miss. 1985). It should be added, because we seem so often to forget it, that the right of a party to *212 have fact issues so measured resolved by a jury is of constitutional stature. City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss. 1983).
While we have no such case, other states having comparable standards for determining when a fact question may be taken from the jury have applied that test to Section 2-608 substantial impairment questions. See Shelton v. Duncan, 385 So.2d 1329, 1332 (Ala. Civ. App. 1980); Bergenstock v. Lemay's G.M.C., Inc., 118 R.I. 75, 372 A.2d 69, 72 (1977); Black v. Don Schmid Motor, Inc., et al, 232 Kan. 458, 657 P.2d 517, 522 (1983); Hays Merchandise, Inc. v. Dewey, 78 Wash.2d 343, 474 P.2d 270, 8 UCCRS 31 (1970).
No doubt the impairment of Rester's Renault was not so great as that in Volkswagen of America, Inc. v. Novak, 418 So.2d 801 (Miss. 1982) where the automobile's engine failed and was replaced three times. Still, taking the evidence recited above and considering it in the light most favorable to Rester, we may not label unreasonable jurors who may have found the value of the Renault substantially impaired to Rester.
The judgment of the Circuit Court is reversed and this case is remanded for a new trial on all issues.
REVERSED AND REMANDED
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and DAN M. LEE, PRATHER and ANDERSON, JJ., concur.
HAWKINS, J., dissents by separate written opinion.
SULLIVAN, J., not participating.
HAWKINS, Justice, dissenting:
I respectfully dissent. My reasons will be set forth if and when a petition for rehearing is filed.[1]
NOTES
[1] This action pre-dates the Motor Vehicle Warranty Enforcement Act, Miss. Code Ann. §§ 63-17-151, et seq. (Supp. 1985), effective July 1, 1985.
[2] Rester gave no details of these other two stalls, where or when they occurred, or what repairs, if any, were necessary to get the car operating after each stall.
[3] In this opinion the word "seller" is used to include all Defendants/Appellees, Tommy Morrow A.M.C., Inc., Martin Motor Sales, and American Motor Sales Corp. See Volkswagen of America, Inc. v. Novak, 418 So.2d 801, 804 (Miss. 1982).
[4] For cases accepting the subjective standard of Section 2-608 but viewing it with some degree of objectivity see Keen v. Modern Trailer Sales, Inc., 40 Colo. App. 527, 578 P.2d 668, 24 UCC 881 (1978); Werner v. Montana, 117 N.H. 721, 378 A.2d 1130, 22 UCC 894 (1977); Asciolla v. Manter Oldsmobile-Pontiac, Inc., 117 N.H. 85, 370 A.2d 270, 21 UCC 112 (1977); Stamm v. Wilder Travel Trailers, 44 Ill. App.3d 530, 3 Ill.Dec. 215, 358 N.E.2d 382 20 UCC 1142 (1976); Stroh v. American Recreation & Mobile Home Corp. of Colo., 35 Colo. App. 196, 530 P.2d 989, 16 UCC 726 (1975); Overland Bond & Investment Corp. v. Howard, 9 Ill. App.3d 348, 292 N.E.2d 168, 11 UCC 945 (1972).
[1] This case has been in the bosom of this Court far too long already. Because of this, even though I have some strong views, I shall not detain it longer with an explanatory dissent, creating a possibility of still further delay. If perchance there is a petition for rehearing filed, there will be an opportunity to express my views.