**ALUMINUM LINE PRODUCTS COMPANY, Appellant,**

v.

**ROLLS–ROYCE MOTORS, INC. et al., Appellees.**

[Cite as *Aluminum Line Products Co. v. Rolls–Royce Motors, Inc.* (1994), 98 Ohio App.3d 759.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 59790.

Decided Nov. 21, 1994.

*Spangenberg, Shibley, Traci & Lancione, Peter H. Weinberger* and *Dennis R. Landsowne,* for appellant.

*Hahn Loeser & Parks, David C. Weiner* and *R. Steven DeGeorge,* for appellees.

HARPER, Judge.

Aluminum Line Products Company ("Aluminum Line") purchased a 1982 Rolls–Royce Silver Spur automobile ("the vehicle") from Qua Buick, Inc. ("Qua Buick") on November 16, 1982 for a purchase price of $95,318. The purchase price was remitted to Qua Buick at the time of delivery. Aluminum Line received a "Rolls–Royce Motors Limited Warranty" when it purchased the vehicle.

The vehicle suffered from a multitude of problems, both cosmetic and mechanical, leading to repeat service by Qua Buick. Kenneth Wessel, the president and principal shareholder of Aluminum Line, penned a letter to Rolls–Royce Motors, Inc. ("Rolls–Royce") on October 29, 1985, in which he set forth: "I have no recourse but to ask for the TOTAL recall and disposition of this motor car." A copy of this letter was sent to Qua Buick.

Aluminum Line subsequently filed an action in the Court of Common Pleas of Cuyahoga County for breach of warranties, express and implied, and for attorney fees under the Magnuson–Moss Warranty Act, Section 2301 *et seq.*, Title 15, U.S. Code ("Magnuson–Moss Act"). The trial court entered judgment in favor of Rolls–Royce and Qua Buick. As part of its decision, the court found that Aluminum Line did not state a claim for revocation of acceptance; even if it had, the court concluded that the facts of the case did not support such a claim.

This court in *Aluminum Line Products Co. v. Rolls–Royce Motors, Inc.* (Apr. 2, 1992), Cuyahoga App. No. 59790, unreported, 1992 WL 67646, held that appellant Aluminum Line was deprived of the benefits of the limited warranty on the vehicle and that the warranty failed in its essential purpose. We also held that Aluminum Line should receive attorney fees under the Magnuson–Moss Act,

but that it failed to present evidence with reasonable certainty on the issue of damages. Finally, we agreed with the trial court that Aluminum Line's claim for rescission was not equivalent to a claim for revocation of acceptance; therefore, we did not review the trial court's determination that Aluminum Line was not justified in its revocation of acceptance.

The Supreme Court of Ohio in *Aluminum Line Products Co. v. Rolls–Royce Motors, Inc.* (1993), 66 Ohio St.3d 539, 613 N.E.2d 990, addressed the sole issue of whether Aluminum Line's plea for rescission "is essentially equivalent to a request to revoke acceptance." *Id.* at 540, 613 N.E.2d at 991. Having answered the question in the affirmative, the court reversed our ruling that Aluminum Line did not properly plead a claim for revocation of acceptance. On remand, we are now called upon to conduct "a thorough review of the record and an evaluation of the propriety of the trial court's determination that such revocation was unjustifiable." *Id.* at 544, 613 N.E.2d at 993.

R.C. 1302.66 enunciates the standards by which a party may revoke acceptance of non-conforming goods as follows:

"(A) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it:

"(1) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

"(2) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

"(B) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

"(C) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them."

In order to recover under R.C. 1302.66, it is essential that a buyer establish each element of division (B). The party must, therefore, demonstrate that the revocation occurred (1) within a reasonable time, (2) before any substantial change in condition, and (3) after giving notice to the seller. See *Konicki v. Salvaco, Inc.* (1984), 16 Ohio App.3d 40, 16 OBR 43, 474 N.E.2d 347.

The Supreme Court in *Aluminum Line Products Co.* found that Aluminum Line satisfied the initial requirement of R.C. 1302.66(B) when it provided written notice to Rolls–Royce and Qua Buick of its desire to revoke acceptance of the vehicle. *Aluminum Line Products Co.*, 66 Ohio St.3d at 542, 613 N.E.2d at 992.

The court noted that a letter sent to Qua Buick included Aluminum Line's intention to have the vehicle recalled and disposed of; although Aluminum Line continually used the word "rescission," the documents submitted and the arguments presented to the trial court clearly supported Aluminum Line's proposal that it sought to revoke acceptance of the vehicle. *Id.*, 66 Ohio St.3d at 542–543, 613 N.E.2d at 992–993. The question that thus remains is whether Aluminum Line had a right to revoke its acceptance just prior to the expiration of Rolls–Royce's three-year limited warranty, *i.e.*, whether the attempted revocation occurred within a reasonable time and without a substantial change in the condition of the vehicle.

In *McCullough v. Bill Swad Chrysler–Plymouth, Inc.* (1983), 5 Ohio St.3d 181, 5 OBR 398, 449 N.E.2d 1289, a 1978 vehicle, purchased in May 1978 from Bill Swad Chrysler–Plymouth ("Bill Swad"), manifested continuing mechanical and cosmetic problems after delivery. Repairs took place, but the vehicle would inevitably be returned to Bill Swad for more repairs, with some of the problems surfacing only after servicing of the vehicle. In January 1979, even though Bill Swad was no longer under an obligation to service the vehicle, having been succeeded by another dealer, the buyer addressed a letter to Bill Swad. This letter informed Bill Swad that the buyer wished to rescind the purchase agreement and to recover a refund of the purchase price. Moreover, although the buyer offered to return the vehicle to Bill Swad upon receipt of shipping instructions, Bill Swad did not respond to the letter. The buyer, therefore, continued to operate the vehicle.

The buyer thereafter filed a complaint on January 12, 1979. By the time of trial on June 25, 1980, the vehicle's odometer indicated it had been driven 35,000 miles, 23,000 of which were accumulated after Bill Swad's receipt of the buyer's letter of notification of revocation. *Id.*, 5 Ohio St.3d at 182, 5 OBR at 400, 449 N.E.2d at 1291.

At trial, Bill Swad asserted that the buyer's continued operation of the vehicle after advising it of revocation was inconsistent with having relinquished ownership of the car. Therefore, the value of the car to the buyer was not substantially impaired by the alleged nonconformities. Finally, the warranties furnished to the buyer supplied the only legal remedy for alleviating the vehicle's alleged defects. *Id.*, 5 Ohio St.3d at 183, 5 OBR at 401, 449 N.E.2d at 1292. The sole issue before the Supreme Court thus became whether the buyer's continued operation of the vehicle waived her right to revoke the initial acceptance under R.C. 1302.66(A)(1), (B), and (C). *Id.*, 5 Ohio St.3d at 182–183, 5 OBR at 400, 449 N.E.2d at 1292.

The *McCullough* court initially recognized that whether continued use of goods after revocation vitiates the revocation is solely dependent upon the reasonableness of the use. It did so by relying on decisions from other jurisdictions. *Id.*, 5

Ohio St.3d at 183, 5 OBR at 401, 449 N.E.2d at 1292; see *Johannsen v. Minnesota Valley Ford Tractor Co.* (Minn.1981), 304 N.W.2d 654; *Pavesi v. Ford Motor Co.* (1978), 155 N.J.Super. 373, 382 A.2d 954; *O'Shea v. Hatch* (1982), 97 N.M. 409, 640 P.2d 515; *Mobile Home Sales Mgt., Inc. v. Brown* (1977), 115 Ariz. 11, 562 P.2d 1378. Moreover, it acknowledged that whether such use is reasonable is a question to be determined by a trier of fact. *McCullough,* 5 Ohio St.3d at 183, 5 OBR at 400, 449 N.E.2d at 1292; see *Johannsen; Uganski v. Little Giant Crane & Shovel, Inc.* (1971), 35 Mich.App. 88, 192 N.W.2d 580; *George v. Fannin* (1990), 67 Ohio App.3d 703, 588 N.E.2d 195; and *Funk v. Montgomery AMC/Jeep/Renault* (1990), 66 Ohio App.3d 815, 586 N.E.2d 1113.

Triers of fact were then supplied with the following guideline to determine whether a buyer's continued use of a good after revocation of its acceptance was reasonable. A trier of fact must ask itself the following questions: (1) what instructions, if any, did the seller provide to the buyer upon being notified of the buyer's revocation of acceptance; (2) did business needs or personal circumstances compel the buyer's continued use; (3) during the period of continued use, did the seller persist in its assurance to the buyer that all nonconformities would be cured or that he would be otherwise compensated for any dissatisfaction or inconvenience suffered by him; (4) did the seller act in good faith; and (5) did the buyer's continued use unduly prejudice the seller? *McCullough,* 5 Ohio St.3d at 184, 5 OBR at 401, 449 N.E.2d at 1293; see *Uganski.*

The existence of the "reasonable use" test and the foregoing questions inherently recognize that buyers may be constrained by circumstances not under their control, circumstances which may be controlled by the seller. "Clearly, to penalize the buyer for a predicament not of his own creation would be patently unjust." *McCullough,* 5 Ohio St.3d at 184, 5 OBR at 401, 449 N.E.2d at 1292; see *Richardson v. Messina* (1960), 361 Mich. 364, 369, 105 N.W.2d 153, 156.

The court in *McCullough* proceeded to find based upon this criteria that the buyer acted reasonably in the continued use of the vehicle even after revocation of acceptance. It provided the following justification for its finding:

First, the buyer was entitled to retain possession of the vehicle, since Bill Swad failed to advise her as to how she should return it after she revoked acceptance of the vehicle. *McCullough,* 5 Ohio St.3d at 184, 5 OBR at 401–402, 449 N.E.2d at 1293; see *O'Shea; Erling v. Homera, Inc.* (N.D.1980), 298 N.W.2d 478; *Frank's Maintenance & Eng., Inc. v. C.A. Roberts Co.* (1980), 86 Ill.App.3d 980, 42 Ill.Dec. 25, 408 N.E.2d 403; *Minsel v. El Rancho Mobile Home Ctr., Inc.* (1971), 32 Mich.App. 10, 188 N.W.2d 9. Since Bill Swad did not respond to the buyer's request for instructions pertaining to the disposition of the vehicle, it was precluded from complaining about the buyer's continued use. *McCullough,* 5 Ohio St.3d at 184, 5 OBR at 402, 449 N.E.2d at 1293. Second, the buyer was

financially limited and thus was in no position to return the defective vehicle and obtain a second one to accomplish personal and business needs. *Id.* Third, Bill Swad's successor, both expressly and tacitly, assured the buyer that the defects were remediable, since it attempted to repair the vehicle even after she had notified Bill Swad of the revocation of acceptance. These assurances thereby induced the buyer to retain possession. *Id.* The court also found that both the successor and Bill Swad failed to act in good faith by not repairing all defects and by the appearance of new defects after service. The absence of good faith was also demonstrated by Bill Swad's and the successor's refusal to honor the full warranty period. *Id.*, 5 Ohio St.3d at 184–185, 5 OBR at 402, 449 N.E.2d at 1293. Finally, the court concluded that Bill Swad was not prejudiced by the continued use of the vehicle. This conclusion was based on the fact that the vehicle, which was driven 12,000 miles at the time of notification of revocation of acceptance, could have been resold. Further, the court found that it was still marketable, even at the time of trial when it registered less than 35,000 miles. Notwithstanding the resale value of the vehicle, the court stated: "In any event, having failed to reassume ownership of the automobile when requested to do so, appellant alone must bear the loss for any diminution of the vehicle's resale value occurring between the two dates." *Id.*, 5 Ohio St.3d at 185, 5 OBR at 402, 449 N.E.2d at 1293.

The court thereafter cited R.C. 1302.85(C) as additional support for the buyer's retention after revocation of the vehicle. This statute provides:

"On rightful rejection or justifiable revocation of acceptance a buyer has a security interest in goods in his possession or control for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care, and custody and may hold such goods and resell them in like manner as an aggrieved seller as provided in section 1302.80 of the Revised Code."

Accordingly, continued use was permissible as it protected the buyer's security interest in the vehicle. *Id.*, 5 Ohio St.3d at 185, 5 OBR at 402, 449 N.E.2d at 1293–1294.

The court went on to consider Bill Swad's argument that even if the buyer's continued use of the vehicle was reasonable, the usage was *"prima facie* evidence" that the vehicle's nonconformities did not substantially impair its value to the buyer. Consequently, Bill Swad proposed that the buyer was precluded from revoking acceptance of it under these circumstances. The court rejected this argument by referring to its recognition that circumstances beyond the buyer's control may mandate continued use, even after revocation of acceptance. "Thus, it cannot seriously be contended that appellee [buyer], by continuing to operate the defective vehicle, intimated that its nonconformities did not substan-

tially diminish its worth in her eyes." *Id.,* 5 Ohio St.3d at 185, 5 OBR at 403, 449 N.E.2d at 1294.

As a last resort, Bill Swad submitted that since the buyer's complaints primarily concerned cosmetic, rather than safety-related, flaws, the defects were trivial. The court first noted that the defects were not merely cosmetic, but were consequential, as some of the buyer's complaints focused on chronic steering, transmission and brake problems. The court next recognized that *"even purely cosmetic defects, under the proper set of circumstances, can significantly affect the buyer's valuation of the good."* (Emphasis added.) *Id.;* see *Pavesi.*

The *McCullough* court elaborated as follows:

"Whether a complained of nonconformity substantially impairs an item's worth to the buyer is a determination exclusively within the purview of the fact-finder and must be based on objective evidence of the buyer's idiosyncratic tastes and needs. *Asciolla v. Manter Oldsmobile–Pontiac, Inc.* (1977), 117 N.H. 85, 370 A.2d 270; *Fargo Machine & Tool Co. v. Kearney & Trecker Corp.* (E.D.Mich.S.D. 1977), 428 F.Supp. 364; *Tiger Motor Co. v. McMurtry* (1969), 284 Ala. 283, 224 So.2d 638. *Any defect that shakes the buyer's faith or undermines his confidence in the reliability and integrity of the purchased item is deemed to work a substantial impairment of the item's value and to provide a basis for revocation of the underlying sales agreement. Durfee v. Rod Baxter Imports, Inc.* (Minn. 1977), 262 N.W.2d 349, at 354; *Asciolla v. Manter Oldsmobile–Pontiac, Inc., supra,* [370 A.2d] at 274. Clearly, no error was committed in finding that the fears occasioned by the recurrent brake failings, steering malfunctions and other mechanical difficulties, as well as the utter frustration caused by the seemingly endless array of cosmetic flaws, constituted nonconformities giving rise to the remedy of revocation." (Emphasis added.) *Id.,* 5 Ohio St.3d at 186, 5 OBR at 403, 449 N.E.2d at 1294.

Taking into consideration Bill Swad's argument that the express and implied warranties furnished to the buyer provided her with a sole remedy, the court outright concluded that the warranties failed of their essential purpose. *Id.* It then quoted from *Gen. Motors Corp. v. Earnest* (1966), 279 Ala. 299, 302, 184 So.2d 811, and expounded as follows:

" ' * * * at some point after the purchase of a new automobile, the same should be put in good running condition, that is, the seller does not have an unlimited time for the performance of the obligation to replace and repair parts.' Clearly, *the hour glass has run on appellant's efforts to place the car in good running order. Thus, notwithstanding appellee's continued operation of the vehicle, the instant action is plainly one which permits the buyer to resort to remedies dehors the warranties."* (Emphasis added.) *Id.,* 5 Ohio St.3d at 186, 5 OBR at 404, 449 N.E.2d at 1295.

The trial court in the present case found that Aluminum Line did not possess the right of revocation of acceptance based upon the following reasons. First, it did not have a right to revoke its acceptance against Rolls–Royce in accordance with *Voytovich v. Bangor Punta Operations, Inc.* (C.A.6, 1974), 494 F.2d 1208, 1211, because Rolls–Royce did not directly sell the vehicle. Second, even if the defects in the vehicle existed, they did not substantially impair the vehicle's value to Aluminum Line because they were "minor, never rendered the Car unusable or otherwise affected the Car's utility, and never posed any safety threat." In support of this finding, the court relied upon the usage of the vehicle by Wessel. Wessel allegedly drove the vehicle for 4,117 miles in ten months prior to seeking any service from Qua Buick. He then drove it for seven weeks and 2,200 miles after its last service and before seeking revocation of acceptance. Third, the trial court found that the fact that Qua Buick "cured 14 of the 17 alleged defects complained of by Wessel" and Wessel's declining Qua Buick's offer to correct a remaining alleged defect precluded a claim for revocation of acceptance. Fourth, since Wessel drove the car regularly for approximately three years prior to the attempted revocation, Aluminum Line did not attempt to revoke acceptance within a reasonable time as required by R.C. 1302.66(B). Moreover, the vehicle's condition substantially changed prior to the attempted revocation, since Wessel drove it approximately 15,000 miles before attempting to revoke acceptance; therefore, under R.C. 1302.66(B), revocation of acceptance is inappropriate. Finally, revocation is inappropriate because Wessel continued to use the vehicle, even though he had other vehicles at his disposal. The trial court concluded that this continued use nullified Aluminum Line's attempted revocation in light of *McCullough.*

An appellate court may not reverse a finding of the trier of fact as being against the weight of the evidence where there is competent, credible evidence in support thereof. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 411, 461 N.E.2d 1273, 1276. Moreover, the weight to be given the evidence and the credibility of the witnesses are issues generally left to the discretion of the fact finder. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

With regard to the trial court's first conclusion, case law in Ohio establishes that a direct buyer-seller relationship must exist in order for the remedy of revocation of acceptance to be available. *Voytovich,* 494 F.2d at 1211; *Funk,* 66 Ohio App.3d at 820, 586 N.E.2d at 1116–1117; *Noice v. Paul's Marine & Camping Ctr., Inc.* (1982), 5 Ohio App.3d 232, 5 OBR 518, 451 N.E.2d 528; *Arrow Internatl., Inc. v. Rolls–Royce Motors, Inc.* (Apr. 17, 1986), Cuyahoga App. Nos. 50305 and 50341, unreported, 1986 WL 4665. The privity requirement is premised upon the distinct nature of the claim which seeks to place the purchaser in

the same position as if he had rejected the goods upon delivery. *Funk,* 66 Ohio App.3d at 820, 586 N.E.2d at 1116–1117; *Noice,* 5 Ohio App.3d at 235, 5 OBR at 521, 451 N.E.2d at 532.

This court in *Arrow* fully discussed the impact of these decisions in the context of an action to revoke acceptance of a vehicle against both the car dealer and the manufacturer. We first noted the general rule that car dealers are purchasers from the manufacturer and only agents insofar as they have the authority to extend the manufacturer's limited warranty to their customers. *Arrow,* citing *Conte v. Dwan Lincoln–Mercury, Inc.* (1976), 172 Conn. 112, 374 A.2d 144. We concluded that in the absence of any evidence that the dealer was the agent of the manufacturer in the sale of the automobile, the lack of privity between the manufacturer and the customer precluded an action to revoke acceptance against the manufacturer. *Arrow;* see *Funk,* 66 Ohio App.3d at 820, 586 N.E.2d at 1117.

■ An agency is established when (1) the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted the agent to act as having such authority; and (2) the person dealing with the agent knew of the facts, and acting in good faith, had reason to believe and did believe that the agent possessed the necessary authority. *Funk,* 66 Ohio App.3d at 820, 586 N.E.2d at 1117; *Logsdon v. Main Notingham Invest. Co.* (1956), 103 Ohio App. 233, 3 O.O.2d 289, 141 N.E.2d 216; *Arrow; Mancino v. Capital Natl. Bank* (May 7, 1981), Cuyahoga App. No. 43061, unreported, 1981 WL 4927.

■ To the extent that the trial court herein definitively ruled that Aluminum Line could not revoke acceptance against Rolls–Royce based on *Voytovich* alone, it erred in not determining whether an agency existed between the dealer and manufacturer. Nonetheless, a review of the record fails to reveal any evidence that an agency relationship existed between Qua Buick and Rolls–Royce with regard to the sale of the vehicle. Defense Exhibit No. 2 illustrates that Qua Buick was the dealer that imported the vehicle from Rolls–Royce, and that the vehicle had a suggested retail price of $119,611. There is no evidence that Aluminum Line was under the impression that Qua Buick was actually negotiating the sales price of the vehicle, which was reduced to $95,318, on behalf of Rolls–Royce. Although it is apparent that representatives for Rolls–Royce actively participated in the decisions pertaining to the warranty service on the vehicle, and an agency existed with regard to administering the warranty, it cannot be extrapolated that an agency existed between Qua Buick and Rolls–Royce with regard to the sale of the vehicle. See *Funk,* 66 Ohio App.3d at 820–821, 586 N.E.2d at 1117; *Arrow.* As was stated by the court in *Funk,* "[a]gency for the one purpose does not necessarily imply agency for the other." *Id.,* 66 Ohio App.3d at 821, 586 N.E.2d at 1117. Accordingly, Aluminum Line did not

have a right to revoke acceptance of the vehicle as against Rolls–Royce, the manufacturer.

The trial court also found that Aluminum Line did not revoke acceptance within a reasonable time as required by R.C. 1302.66(B) for two reasons. First, Wessel drove the vehicle for a three-year period prior to seeking revocation of acceptance. Additionally, revocation was not reasonably timely because the mileage amounted to approximately 15,000 miles before Aluminum Line attempted revocation.

In *Funk*, the trial court directed a verdict in favor of the defendant, Montgomery AMC, because the purchaser's "attempt at revocation came 'far too late' because age and mileage had already substantially impaired the value of the car."[1] *Funk*, 66 Ohio App.3d at 819, 586 N.E.2d at 1116. The Hamilton County Court of Appeals found that the trial court erred in directing the verdict based upon age and mileage because these statistics are not necessarily dispositive of the reasonableness of the revocation. *Id.*, 66 Ohio App.3d at 819–820, 586 N.E.2d at 1116. See *Evans v. Graham Ford, Inc.* (1981), 2 Ohio App.3d 435, 2 OBR 529, 442 N.E.2d 777 (the time which plaintiffs had vehicle and miles put on the vehicle were factors to be considered in determining whether revocation of acceptance occurred within reasonable time, but were not controlling factors).

As applied to the case before us, we also find that the age of the vehicle and its mileage did not render Aluminum Line's revocation untimely. At the time Wessel directed his letter to Rolls–Royce in October 1985, the vehicle had been driven 14,814 miles. This amount (14,814 miles) in a three-year period is well below the commonly recognized standard of driving a vehicle an average of 10,000 miles per year. Further, even though Aluminum Line technically possessed the vehicle for three years, clearly it spent many a day in Qua Buick's service center.[2] Additionally, the nearly 15,000 miles logged on the vehicle before Aluminum Line's attempt to revoke acceptance did not substantially impair the value of the vehicle. See *McCullough* (vehicle driven 12,000 miles at the time of notification of revocation of acceptance did not prejudice seller because vehicle could have

---

1. The case does not disclose the exact mileage logged on the purchaser's vehicle. The only indication as to how long the purchaser owned the vehicle is that she experienced problems with its cooling and electrical system for two consecutive summers, and she sought to revoke acceptance of the 1982 Renault in October 1983.

2. An accurate calculation as to how long the vehicle remained at Qua Buick for service cannot be tabulated because the dates on the individual service orders, which are meant to illustrate when the vehicle was brought in, serviced, and returned to Aluminum Line, infrequently correspond to one another. For example, Plaintiff's Exhibits 22 and 22–A disclose that a service order was written on August 1, 1984; the time clock logged service as taking place on July 29, 1984; and the warranty claim form shows the work was completed on October 4, 1984.

been resold; even when odometer read 35,000 miles at the time of trial, vehicle was still marketable).

■ The trial court further found that the defects complained of by Aluminum Line were "minor, never rendered the Car unusable or otherwise affected the car's utility, and never posed any safety threat." Therefore, the "defects" did not substantially impair the vehicle's value.

Wessel testified at trial with regard to how these "defects" affected Aluminum Line as follows:

"Q. So we are clear on something, Mr. Wessel, did this car live up to the Aluminum Line Products Company's expectations?

"A. No.

" * * *

"Q. Why not?

"A. It didn't perform, it was unusable.

"It was unusable the bulk of the time that we had it.

" * * *

"Q. Did any of the defects or problems that you have identified shake Aluminum Line Products Company's faith in your reliability of this vehicle?

"A. Yes.

"Q. Which ones?

"A. The brake system, height control mainly."

■ As stated *supra* in *McCullough*, "[a]ny defect which shakes the buyer's faith or undermines his confidence in the reliability and integrity of the purchased item is deemed to work a substantial impairment of the item's value and to provide a basis for revocation of the underlying sales agreement." *McCullough*, 5 Ohio St.3d at 186, 5 OBR at 403, 449 N.E.2d at 1294. The trial court's conclusion that the vehicle's value was not substantially impaired because Aluminum Line complained of "trivial" defects is thus not completely supported by applicable law. Wessel testified with regard to the purpose of Aluminum Line's purchase of a luxury automobile, specifically the Rolls–Royce. The vehicle was used to transport clients, and undoubtedly also used to pamper and impress them. With this purpose in mind, a vehicle which suffers from incurable defects that are unpleasing to the eye and result in a "hard ride" does little to effectuate the desired result. The defects are thus not "trivial" to Aluminum Line, since they shook Aluminum Line's faith in the vehicle's reliability.

There are two remaining grounds for the trial court's conclusion that Aluminum Line did not revoke acceptance of the vehicle. The first ground is based upon Wessel's continued use of the vehicle after he notified Qua Buick of his intention, and the second one focuses on Qua Buick's repair of a majority of the vehicle's problems and Wessel's declining its offer to remedy a remaining flaw.

It is undisputed that Aluminum Line was afforded a three-year or 50,000 mile warranty on the vehicle at the time of purchase. It is also undisputed that when a purchase of goods takes place, the buyer believes that the goods will be delivered either in a fit condition, or the warranty that accompanies the goods will guarantee that they will be repaired to a fit condition. Qua Buick was always ready and willing to take the vehicle in for repair and it was even willing to continue the repairs after Aluminum Line notified it of the revocation. In *Alum. Lines Products Co.* (Apr. 2, 1992), this court found that Aluminum Line was deprived of the benefits of the limited warranty on the vehicle and that the warranty failed of it essential purpose. As the court in *McCullough* adopted from *General Motors Corp. v. Earnest,* we so adopt:

" ' * * * at some point after the purchase of a new automobile, the same should be put in good running condition, that is, the seller does not have an unlimited time for the performance of the obligation to replace and repair parts.' Clearly, the hour glass has run on appellant's efforts to place the car in good running order. * * *" *McCullough,* 5 Ohio St.3d at 186, 5 OBR at 404, 449 N.E.2d at 1295.

We acknowledge that Aluminum Line was no doubt financially able to procure another vehicle when the 1982 Silver Spur was exhibiting continued difficulties, unlike the purchaser in *McCullough,* a clerical secretary who could not afford such a venture. However, the trial court's insistence that Aluminum Line had other vehicles to rely on is not evidenced in the record. Wessel personally owned other vehicles, but he testified that the 1982 Silver Spur was the only company vehicle and it is Aluminum Line after all which sought revocation of acceptance.

■ Although the trial court did not refer to all of the questions posed by the *McCullough* court in determining whether Wessel's continued use of the vehicle was proper after notice of revocation of acceptance,[3] we must discuss the reasonableness of Wessel's continued use in accordance with all of the questions. First, we note Wessel requested in his October 29, 1985 letter that he be advised as to the disposition of the vehicle when it registered 14,814 miles. Rolls–Royce

---

**3.** As a reminder, these questions deal with (1) the seller's disposition instructions; (2) the buyer's reason for continued use; (3) the seller's assurances that the vehicle would be fixed during the continued use, or any other compensation negotiations; (4) the seller's good faith; and (5) the prejudice, if any, resulting from the continued use.

only responded in correspondence dated November 13, 1985 that Wessel's October 29, 1985 letter was forwarded to the service department so that "we can resolve any problems which may remain." Therefore, rather than instruct Wessel as to the disposition of the vehicle, neither Rolls–Royce nor Qua Buick responded except to suggest continued service. See *McCullough* (seller's failure to respond to buyer's request for instructions pertaining to disposition of vehicle precluded seller from complaining about the buyer's continued use of the vehicle). Second, as stated *supra*, there is no evidence in the record which shows that Aluminum Line owned any other vehicle for business purposes. Third, not only did Qua Buick attempt to repair the continuing problems with the vehicle prior to Aluminum Line's notice of revocation, it continued in this attempt after notice. Fourth, we question whether Qua Buick acted in good faith in the repair of the vehicle. Qua Buick's position was that Wessel was a finicky buyer and he was disturbed by the reduction in the sale price of later model Silver Spurs. According to Qua Buick, the combination of this personality trait and the dissatisfaction prompted the revocation of the vehicle rather than the vehicle's malfunctioning and/or cosmetic defects. Qua Buick's insistence that nothing was truly wrong with the vehicle, particularly that its height control system never malfunctioned, quite honestly conflicts with any declaration that it acted in good faith. The conflict is enhanced by the fact that Wessel was a Rolls–Royce patron without any indication of previous disappointment. It is also enhanced by the fact that Aluminum Line paid the negotiated sale price for the vehicle in full and in cash. Aluminum Line thus possessed the entire interest in the vehicle and had every right to assume that it would function properly or be made to function properly. Finally, as we discussed *supra*, we find no evidence that Wessel's continued use of the vehicle after the October 29, 1985 notice unduly prejudiced Qua Buick.

In conclusion, the trial court's reasons for concluding that Aluminum Line's revocation was neither timely nor done without a substantial change in the vehicle's condition are not supported by competent, credible evidence. Our review of the record demonstrates that Aluminum Line timely notified Qua Buick of the revocation of acceptance of the vehicle without any substantial change to its condition. The trial court's ruling that the evidence presented at trial failed to prove the elements of revocation of acceptance is accordingly reversed. Compare *George* (even if buyer revoked acceptance of draperies, rather than rejected them, buyer's continued use of draperies for approximately one year was an unreasonable use that waived revocation, where buyer continued to use the goods after her initial complaint without any attempts to remedy the deficiencies on behalf of the seller or any indication as to disposition of the goods).

Judgment entered in favor of Aluminum Line as to the sole issue of revocation of acceptance under R.C. 1302.66.

*Judgment accordingly.*

NAHRA, C.J., and BLACKMON, J., concur.