Margaret **CHAPLIN** and **T. G. Chaplin, Jr.,**
d/b/a Richmond Ice Cream
Company, Appellants,

v.

**BESSIRE & COMPANY, Inc., Appellee.**

Court of Appeals of Kentucky.

Oct. 19, 1962.

Eugene S. Wiggins, Richmond, for appellant.

Thomas D. Shumate, Richmond, for appellee.

PALMORE, Judge.

This suit was brought by the buyers against the seller to rescind a conditional sales contract and recover what had been paid on the contract price, together with special damages. The seller counterclaimed for the unpaid balance of the purchase price and the enforcement of its security rights. The controversy was submitted to a jury, which returned a verdict upholding the rescission but awarding the buyers less than the amount they had paid on the contract, which therefore was less than the very minimum recovery to which they were entitled upon a valid rescission. The trial court subsequently sustained the seller's motion for a judgment n. o. v., overruled a CR 50.03(2) motion of the buyers for a new trial, and entered judgment dismissing the complaint and awarding the seller full recovery on its counterclaim. The buyers appeal.

■ The ground on which rescission was sought to be justified was breach of warranty, and on the particular issue of whether the property bought and sold was in fact defective, thus breaching the warranty, we can say without further ado that the evidence was amply sufficient for submission to the jury. The critical question on this appeal, however, is whether, if there was a breach, as a matter of law the buyers failed to rescind within a reasonable time after discovering it. This apparently is the point on which the trial court ultimately determined to override the verdict of the jury.

The broad principles governing the buyer's right to rescind a sale of personal property for breach of warranty were codified by § 69 of the Uniform Sales Act, which section seems to have been substantially declaratory of the prevailing case law and, at the time this controversy arose, was in force here as KRS 361.690. (The same basic policies, except as to "election," continue to apply under § 2–608 of the Uniform Commercial Code, KRS 355.2–608. See Anderson's Uniform Commercial Code, Vol. 1, pp. 365–370.)

■ It is fundamental that the purchaser who desires to rescind must act "within a

reasonable time, taking all of the circumstances into consideration." Annotation, "Time for rescission by purchaser of chattel for fraud or breach of warranty," 72 A.L.R. 726, 729, and cases there cited, including Church v. Wright Mach. Co., 1921, 190 Ky. 561, 227 S.W. 1003, in which it was said that "all this depends upon the nature of the property and circumstances of the case. There is no hard and fast rule by which to determine what is and what is not an unreasonable delay * * *:"

■ "The reasonable time in which a purchaser of chattels must rescind the contract runs only from the time the purchaser had knowledge of or is reasonably chargeable with knowledge of the breach of warranty." Reno Sales Co. v. Pritchard Industries, C.A. 7, 1950, 178 F.2d 279, 281, citing 72 A.L.R. 726, 740. South Bend Pulley Co. v. W. E. Caldwell Co., 1899, 54 S.W. 12, 21 Ky.Law Rep. 1084. According to the nature of the case, disillusionment and discovery may, of course, come by degrees. Cf. Lambach v. Lundberg, 1934, 177 Wash. 568, 33 P.2d 105, 108. In that event the question of what is reasonable becomes doubly difficult.

■ "Since the question as to what is a reasonable time * * * depends on the facts of the particular case, and is frequently a matter as to which different conclusions may reasonably be drawn, it is well settled that ordinarily the question is one of fact for the jury." Annotation, 72 A.L.R. 726, 753, citing cases including A. C. Morris & Co. v. Heaton, 1930, 235 Ky. 66, 29 S.W.2d 617, 619.

The material facts to which the foregoing principles must be applied in determining whether in this case the delay of the buyers in attempting to rescind was so obviously unreasonable as to preclude submission of the issue to the jury are as follows:

Bessire and Company, Inc. (hereinafter called Bessire), the seller, which has an office at Louisville, Kentucky, deals in and sells an extensive line of equipment and supplies for bakeries and dairies. It has conducted this business for many years. Among its regular customers in 1957 were Margaret Chaplin and son, T. G. Chaplin, Jr., partners doing business as Richmond Ice Cream Company, who were engaged in manufacturing and selling ice cream and related products and had their plant at Richmond, Kentucky. The son, whom we shall simply call Chaplin, was the manager. During 1957 he negotiated with Bessire, with which he had periodic personal contact through the visits of its salesman, Tisdale, to the ice cream plant in Richmond, for the purchase of a walk-in "hardening box," meaning an insulated chamber capable of holding a low temperature for the proper storage of ice cream and similar products and for hardening freshly manufactured mixes. In September of 1957 Chaplin ordered the box and certain auxiliary equipment at a total price of $6533, which included $600 for installation by the seller. The major portion of this amount was payable in installments falling due monthly during the 6-month season of May through October in each of the years 1958, 1959, and 1960.

Bessire caused the box to be manufactured and delivered to Richmond by the Central Fixture Company, of Indianapolis, Indiana. Its dimensions were 30′ x 20′ horizontally and 8 feet in height, and it was delivered in 20′ x 5′ sections which were put together and set on a concrete slab Chaplin had been directed to have ready in advance. The assembly work was done in the latter part of October, 1957, by or under the direction of the men who came with the truck from Central. The truck bed was unprotected, and it was raining when they arrived. It rained again the day after the assembly work was completed, and Chaplin at once observed that water was dripping inside through the seams where the sections were put together to form the top of the box. He telephoned Bessire, and promptly its chief officer at Louisville, Mr. Bresler, together with Tisdale and a Mr.

Horine from Central (all of whom had previously looked over the plant during the negotiation stage in order to formulate the necessary specifications) came to Richmond. During this inspection visit Chaplin for the first time was advised that it would be necessary for him to build a protective roof over the box. On the next day, November 1, 1957, Bresler wrote him a letter expressing regret that the box had become water soaked and a willingness to do whatever was necessary to correct the situation. This letter confirmed what had been agreed on by the parties at Richmond the day before, which was, in substance, that holes would be drilled to drain the water out of the porous insulating material in the ceiling sections, all the seams and openings would then be recaulked, and an additional 4 inches of insulation would be applied to the under side overhead, following which both Bessire and Central would "guarantee this box to perform and give satisfactory service. By this, we guarantee that there will not be any air leaks and that proper temperatures will be maintained within the box."

The corrective measures mentioned in Bresler's letter were accomplished during November and Chaplin accepted the box. He signed the formal conditional sales contract early in December, 1957. During the winter months of 1957–58 the box gave satisfactory service, but in May of 1958 when the weather became warm Chaplin began to notice cracks in the ceiling through which water apparently had seeped and formed icicles. He says he had trouble keeping a proper temperature in the room and that the higher the temperature was, the more icicles formed. When Tisdale called on his regular rounds about once a month Chaplin says he notified him of this trouble and showed him the condition. Tisdale said he would report the situation, but there was no subsequent response from Bessire or Central. On each of the several occasions Tisdale visited the plant during the next few months Chaplin renewed

his complaint, and in each instance Tisdale again assured him that he would report it. Meanwhile, throughout the summer season of 1958 the box was in full use and appears to have served its purpose despite the imperfections. Finally Chaplin telephoned Bessire in November of 1958 and said that if they did not come and check the box he would stop paying his installments (at this time, however, he had paid but two of the six installments due in 1958). The result of this action was that Bessire contacted Central, and in February of 1959 Horine and another Central representative from Indianapolis came to Richmond and inspected the box. They advised Chaplin the cause of his trouble was that the roof he had put over the box in November of 1957 was sealed too tight, and if he would cut air vents in it, that would correct the difficulty. So Chaplin then had vents cut along the sides of the elevated roof (which roof, it will be recalled, had been constructed at Bessire's suggestion in November of 1957 as one of the requisites of its guaranty that the box would thereafter perform satisfactorily).

During the cold months of the 1958–59 winter the hardening room gave no trouble, but with the advent of spring icicles began to form again, and water dripped from the top. The ceiling developed more cracks. (The added insulation applied to the ceiling in November, 1957, consisted of two 2-inch layers of styrofoam slabs in 1′ x 3′ sections, bonded by a mastic composition, with the slabs or sections staggered so as to offset the seams. Both the styrofoam and mastic are or were supposed to be impervious to water, whereas the fiber insulating material inside the ceiling and walls of the box itself was not.) The straw that broke the camel's back, to Chaplin's way of thinking, came on May 6, 1959, when an electrical fuse blew out, stopping the refrigeration machinery, and in the relatively brief period of three hours or less before the difficulty was discovered and the fuse replaced the

temperature in the hardening box rose some 32 degrees, resulting in spoilage and loss of $777 worth of ice cream. Immediately Chaplin telephoned Bessire's Louisville office and requested that someone be sent to Richmond to fix the box (that is, so as to prevent rapid loss of temperature). Having received no response by May 15, 1959, on that date he had his attorney write Bessire a letter rescinding the sale and tendering a return of the box.

■ (During the interim between May 9 and May 15, 1959, Chaplin paid the equivalent of two monthly installments on his contract with Bessire. It is possible, of course, for a party to waive his right of rescission by treating the contract as still in force after he knows of the breach of warranty. But at this time Chaplin was in arrears, and he says he made those payments under the impression that he would have to be paid up in order to be in a position to rescind. Moreover, he had not yet made the decision to rescind, being still in hope that Bessire would rectify the situation. Thus the payment of these installments was but one episode in the chain of circumstances to be considered in determining whether, when the choice to rescind finally was made on May 15, 1959, Chaplin's acts and omissions up to that time were such that it was unreasonable to say he had not waived his right to do so.)

Following the letter of rescission Chaplin permitted representatives of Bessire and Central to inspect and test the hardening room at Richmond. They concluded that the trouble was in the refrigeration machinery rather than the box, and Bessire refused to accept the tendered return.

At this point it bears repeating that whether the box was in fact defective and unfit for its intended use was a question for the jury, but in discussing whether Chaplin acted to cancel within a reasonable time we must assume that it was. Granted, then, that it was unfit, at what point does reason dictate that Chaplin was obliged to abandon ship?

■ As we have already suggested, realization that a defect exists and is irremediable may from the nature of the situation come gradually. As the signs of trouble appeared in this box Chaplin can hardly be expected to have anticipated at once that Bessire, a reputable house with which he had theretofore done business and in whose guaranty he had good reason to place confidence, would not be able to detect the cause and remedy it. In the first place, according to the testimony of Chaplin's expert witness the difficulty was caused by a gradual accumulation of ice within the walls and roof of the box, resulting in a reduction of its insulating capacity, and this process could have taken as long as two years in progressing to its maximum destructive effect. Thus in the beginning the manifestations of faulty performance may not have appeared serious enough to justify such an extreme measure as cancellation. Secondly, with a large and costly installation such as the one involved in this case, the buyer has a least a moral right, if not a legal duty, to give the seller a fair opportunity to correct the defective condition, and certainly he does not lose his right of rescission by first exhausting that avenue.

■ It has been said that while the seller is engaged in an effort to remedy the defects the "reasonable time" within which the buyer must rescind does not run. Heibel v. United States Air Conditioning Corp., 1939, 206 Minn. 288, 288 N.W. 393, 394. And if the buyer promptly calls upon the seller to make his warranty good the time should not begin to run against the buyer until it is no longer reasonable for him to expect that the seller can and will do so.

■ The cases in which a buyer has been permitted to rescind after using the property for more than a season or year are not plentiful. However, most cases of this sort have involved items of shorter durability than a walk-in refrigeration chamber. A year in the life of an automobile is not to be equated with a year in the

anticipated life of a long-term fixture. One of the important considerations in determining whether a rescission was reasonably prompt is the possibility of prejudice to the seller. In this case there is no evidence to indicate that the seller was any more prejudiced by the cancellation in May of 1959 than it would have been a year earlier. On the whole case we conclude that reasonable men may well differ on whether Chaplin acted in due season, and that the question therefore was in the province of the jury. Hence the trial court's judgment n. o. v. was in error.

The decisions of this court on which Bessire relies are distinguishable:

(1) A. C. Morris & Co. v. Heaton, 1930, 235 Ky. 66, 29 S.W.2d 617, involved a milking machine which was delivered November 10, 1926. Shortly thereafter the buyer became ill and took a sojourn in Florida for his health. No complaint was made for 6 months, and a purchase-money note was renewed for an additional 6 months on May 10, 1927, before the buyer elected to rescind. A judgment upholding the recission was reversed on the ground that the buyer delayed unreasonably, in that he admittedly "had time after his recovery of health and return from Florida to try out the machine before he renewed the note. No effort in that direction was made * * * until a month or more after the note was renewed."

In that case the inoperable condition of the machine was readily discoverable, since it was in fact discovered when the buyer undertook to use it, whereas in this case discovery and disillustionment came over an extended period of time during which the buyer had reason to believe that the defect could and would be remedied by the seller. Chaplin did not delay either in putting the property to the test of use or in notifying the seller of its shortcomings as they developed and were observed.

(2) In Gargotto v. Sherman, 1944, 297 Ky. 597, 180 S.W.2d 565, where the subject of the sale was a restaurant, the ground for rescission was fraud, and the buyers discovered the alleged misrepresentation within 9 days after taking the business over. Nevertheless, they continued to operate it and treat the contract as still in force for two months before attempting to rescind. In affirming a judgment for the seller this court said that on discovery of fraud the buyer must act promptly, and "will not be permitted to speculate as to the result of the trade and then rescind after it proves to be unprofitable."

The speculative character of the property is an important factor in determining what is a reasonable time to rescind. Brown v. Hassenstab, 1957, 212 Or. 246, 319 P.2d 929, 934. It was the vital consideration in the Gargotto case. We do not have that situation here, or, if it lurks beneath the surface, at least it is not obvious on the record.

(3) Frick Co. v. Wiley, 1942, 290 Ky. 665, 162 S.W.2d 190, involving a threshing machine, was decided in favor of the seller on the basis of the buyer's failure to comply with a provision of the written sales contract requiring him, in the event of a breach of warranty, to return the machine immediately to the place where received. The court found that the buyer neither returned nor tendered a return of the machine until after he had been sued for the unpaid balance of the purchase price. In the instant case there is no issue on the question of tender.

Bessire makes the further argument that during the pendency of this litigation Chaplin made attempts to sell the hardening box, and by asserting ownership and dominion waived the right of rescission. We see no merit in this contention. Chaplin had tendered a return of the box and Bessire had refused it. Its continued presence in Chaplin's possession obliged him to care for it, thus tending to generate damages that at the same time he was under duty to mitigate. Moreover,

under the express provisions of the Uniform Sales Act he had the right to sell it. KRS 361.690(5) gave to the buyer a lien to secure repayment, with the same enforcement remedies as given the seller by KRS 361.530. These remedies included the right of resale under the conditions set forth in KRS 361.600.

■ We come now to the question of whether the Chaplins are entitled to a new trial, and, the verdict having been patently inconsistent with the instructions, undoubtedly they are.

The instruction covering damages directed the jury, if it found for plaintiffs, to award them $2977.66, the amount theretofore paid toward the purchase price of the property, and authorized further special damages of two categories, (1) installation expenses necessarily incurred and (2) the value of the ice cream lost on May 6, 1959, if the loss resulted from failure of the box to maintain proper temperatures and without negligence on the part of the claimants. Although there was no evidence to justify it, the instruction authorized the jury to deduct from category (1) of the special damages the reasonable residual value to the Chaplins of the concrete slab and certain electrical installations enumerated in the category, such deduction not to exceed $1540.76, that being their cost.

The jurors came in and attempted to return a verdict of $1200 for the plaintiffs, but the trial court directed their attention to the portion of the instruction directing an award of $2977.66 and the portion limiting deductions to $1540.76 (which, of course, had no application to the $2977.66) and sent them back to the jury room to check their calculations. The jury then returned with the following verdict:

"We, the jury, find for the plaintiff $1436.90 damages. The contract is to be rescinded."

The amount of this verdict is the exact difference between $2977.66 and $1540.76, clearly violating the instruction authorizing the deduction only as an offset against whatever the jury might see fit to award on account of the cost of the items to which they were applicable. $2977.66 was, of course, the minimum amount the jury could properly have awarded under a verdict for the plaintiffs.

The Chaplins put on evidence to show that Bessire's failure to remove the hardening box following the rescission and tender cost them $9935.94, and they insist this item should be included in the instructions on another trial. Their claim is that a large refrigeration chamber enabled them to buy special items (called novelties) in quantity at cheaper prices, and to manufacture their weekly requirement of ice cream in 3 days instead of 6. The expenses incident to operating with a smaller space are classified by counsel as expenses of "caring for and storing the hardening room after the contract was rescinded." We do not so regard them.

This hardening box was an addition to the capacity of the plant, and not a replacement for facilities theretofore in existence. When it was shut down on May 15, 1959, the Chaplins were left in the same position they occupied before its acquisition in November of 1957. If there is any fundamental justification for allowance of special damages in a rescission case, it is to restore the aggrieved party to status quo. True, the continued occupancy of space that would otherwise have been available may have prevented the acquisition or construction of a replacement box, but how long it would have taken to accomplish such a process, whether the Chaplins would have done it, and what success might have ensued are all matters of speculation. Moreover, such items as $100 per day for the time Chaplin had to stay in the plant making ice cream instead of doing promotional and selling work on the outside surely must be recognized as too remote for allowance under any standard. In leaving this phase of the case we cannot resist the temptation of

suggesting that if discontinuing the use of this box cost the Chaplins so much in so short a time thereafter, then surely they must have made enough from its use during the 1958 season to pay for it.

The Chaplins make the further contention that certain of the instructions were unnecessary and erroneous. Without reaching the question of whether Nos. 2, 3 and 4 were erroneous and, if so, prejudicial, we agree that they were not necessary and should not be given in the event of a new trial. In substance, No. 1 required the jury, in order to give the plaintiffs a verdict, to find that the hardening box was not as warranted and that the plaintiffs "within a reasonable time after discovering or after they should have discovered the defect or defects therein (if there were defects)" tendered it back to the defendant. No. 2 was a converse statement on the reasonable time in which to rescind, corresponding with the pleaded defense of waiver. Since plaintiffs could not recover under No. 1 unless they had acted within a reasonable time, nothing was added by No. 2. Nos. 3 and 4 instructed that if the failure of the box to maintain proper temperatures resulted from the compressor, or from the failure of the plaintiffs to operate the box in a careful and prudent manner, the law was for the defendant. Again, however, the warranty was that the box "would maintain proper temperatures," and the jury had to find that it "would not." If it "would not" maintain proper temperatures, the efficiency of the compressor and careful management of the user would have been of no avail. In this connection, we note that at one place Instruction No. 1 used the word "did" rather than "would," and this may have invited further qualifying instructions such as Nos. 3 and 4. On another trial the second sentence of No. 1 should be modified to say "in that it was not capable of maintaining" in lieu of "in that it did not maintain."

Judgment reversed with directions that appellants be granted a new trial.