# JORGENSEN et ux, *Plaintiffs-Respondents,*
*v.*
# PRESSNALL, *Appellant.*

545 P2d 1382

*James W. Young* of Bump, Young & Walker, Forest Grove, argued the cause for appellant.

*Pamela G. Daves,* Hillsboro, argued the cause for respondents Jorgensen. With her on the brief was Robert H. McSweeney, Hillsboro.

*Dale M. Hermann,* Portland, argued the cause for respondent Commercial Credit Corporation. With him on the brief were Phillips, Coughlin, Buell, Stoloff & Black, Portland.

O'CONNELL, C. J.

**O'CONNELL, C. J.**

This is a suit for the recission of a mobile home purchase contract and for the recovery of plaintiffs' down payment and damages. Defendants are Pressnall, the seller of the mobile home, and Commercial Credit Company, the company financing the transaction. Commercial Credit counterclaims for losses incurred in repossession of the mobile home and, in the event recission is granted, seeks recovery of damages from Pressnall for breach of a warranty. The trial court found for plaintiffs against Pressnall and for Commercial Credit on its cross-complaint against Pressnall. Pressnall appeals.

Plaintiffs purchased a new mobile home from Pressnall, using their old mobile home as a down payment and financing the balance. Pressnall assigned the financing contract to Commercial Credit, warranting the enforceability of the assigned contract.

Pressnall represented the mobile home to plaintiffs as being of "good, sound construction," and of "medium quality." He also represented to plaintiffs that the mobile home was strong enough to stand up to frequent moves. Plaintiffs were assured that any defects present in the mobile home delivered to them from the factory would be repaired promptly.

The mobile home was delivered to plaintiffs' lot on November 1, 1972. Soon after they moved in plaintiffs discovered water and air leaks, gaps in the "tip out,"[1] as well as defective doors, cabinets, vents and walls. Plaintiffs promptly gave Pressnall a list of these defects and were assured by Pressnall that the problems would be corrected. Thereafter, a series of repair requests yielded no action except the appearance of workmen who were not prepared to make repairs. Finally, plaintiffs, having decided that it was futile to attempt to have the unit properly repaired through

---

[1] The "tip out" is a hinged section that is transported inside the mobile home and then tipped out to widen the living room when the mobile home is set up. This method of construction is necessitated by width limitations for transportation over highways.

Pressnall's efforts, turned the matter over to their attorney and rejected Pressnall's further efforts to make repairs. Thereafter, negotiations were held with a representative of the mobile home manufacturer and as a result three repairmen worked approximately ten hours each repairing defects. However, plaintiffs were not satisfied with the quality of repairs and when a release was tendered to them they refused to sign it. Although some of the defects were cured, the serious problems such as leakage continued and new problems were created.

Concluding that further requests to repair the unit would be futile, plaintiffs instructed their attorney on December 27th, 1972, to send letters to both defendants notifying them of plaintiffs' decision to rescind the purchase contract. Plaintiffs tendered back the new mobile home, subject to their security interest, and demanded return of the down payment as well as consequential damages. On advice of counsel plaintiffs continued to occupy the mobile home until November 15, 1973, approximately three weeks before the trial. The mobile home was repossessed by Commercial Credit in January of 1974 and resold at a loss.

Pressnall contends that plaintiffs did not prove facts sufficient to justify recission, asserting (1) that there is no evidence of a material misrepresentation inducing plaintiffs' purchase; (2) that there is no evidence that the uncorrected defects were material or that they rendered the trailer unfit for use as a dwelling; (3) that recission is not a proper remedy because plaintiffs refused to allow reasonable efforts to repair, and (4) that plaintiffs' continued possession and use of the mobile home constituted an assertion and excercise of the right of ownership inconsistent with their attempted revocation of acceptance.

The contract in question is governed by the Uniform Commercial Code. Specifically, the buyer's right to revoke acceptance is defined in ORS 72.6080, which provides as follows:

"(1) The buyer may revoke his acceptance of a lot or

commercial unit whose nonconformity substantially impairs its value to him if he has accepted it:

"(a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

"(b) Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

"(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

"(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them."

■ Plaintiff's rescission letter constituted a revocation of acceptance within the meaning of the code.[2] When cast in language of the Uniform Commercial Code, Pressnall's contentions are that there is no proof of nonconformities substantially impairing the value of the goods and that there has been no failure to seasonably cure the nonconformities.

■ Whether plaintiffs proved nonconformities sufficiently serious to justify revocation of acceptance is a two-step inquiry under the code. Since ORS 72.6080(1) provides that the buyer may revoke acceptance of goods "whose nonconformity substantially impairs its value *to him*," the value of conforming goods *to the plaintiff* must first be determined. This is a subjective question in the sense that it calls for a consideration of the needs and circumstances of the plaintiff who seeks to revoke; not the needs and circumstances of an average buyer.[3] The second inquiry is whether the noncon-

---

[2] *See, Lanners v. Whitney,* 247 Or 223, 234, 428 P2d 398 (1967).

[3] *See,* Uniform Commercial Code § 2-608, comment 2: "The test is not what the seller had reason to know at the time of contracting; the question

formity in fact substantially impairs the value of the goods to the buyer, having in mind his particular needs. This is an objective question in the sense that it calls for evidence of something more than plaintiff's assertion that the nonconformity impaired the value to him; it requires evidence from which it can be inferred that plaintiff's needs were not met because of the nonconformity. In short, the nonconformity must *substantially* impair the value of the goods to the plaintiff buyer.[4] The existence of substantial impairment depends upon the facts and circumstances in each case.[5]

■ In the present case plaintiffs purchased the mobile home for the purpose of using it as their residence. Because of the defects described above and defendant's failure to cure them, the value of the mobile home to plaintiffs as a residence was substantially impaired. Defendant argues that since plaintiffs did not produce any evidence showing that the cost of repairs were substantial in relation to the purchase price, there was no proof of substantial impairment of value. This argument would have some force if the test for a substantial impairment of value were an objective one. However, since, as we have shown, the test is a subjective one, permitting revocation of acceptance if it is shown that the value *to the purchaser* is impaired, the relatively small amount of money needed to repair the defect is not necessarily relevant because the impairment of the value to the purchaser may be substantial

---

is whether the non-conformity is such as will in fact cause a substantial impairment of value to the buyer though the seller had no advance knowledge as to the buyer's particular circumstances." *See also, Tiger Motor Co. v. McMurtry,* 284 Ala 283, 292, 224 So2d 638 (1969): "We are aware that what may cause one person great inconvenience or financial loss, may not another."

[4] *See,* Uniform Commercial Code § 2-608, comment 2; *Herbstram v. Eastman Kodak Co.,* 68 N J 1, 342 A2d 181, 185 (1975): "Whether there has been a substantial impairment is based upon an objective factual evaluation rather than upon a subjective test of whether the buyer believed the value was substantially impaired."

[5] *Tiger Motor Co. v. McMurtry, supra* note 3.

even though the cost of curing the defect may be relatively small.[6] Thus, in the present case, although the defects in the mobile home probably could have been repaired at a relatively small cost, plaintiffs were deprived of the benefits of a comfortable home for a substantial period of time as a result of defendant's failure to make timely repairs.

■ Defendant also seems to argue that impairment of value is not shown unless the goods are useless for the purchaser's purposes. This is not true; revocation of acceptance is permissible not only where there is complete impairment, but also where the impairment is substantial but not complete.[7]

■■ Pressnall contends that any failure to cure the nonconformities was excused because plaintiffs unreasonably refused to allow further attempts to repair the unit. The record indicates, however, that Pressnall had ample opportunity to cure the defects before the revocation of acceptance occurred, but that he did not act seasonably. A seller does not have an unlimited amount of time to cure the nonconformity.[8]

■ Pressnall's final argument is that plaintiffs' use of the mobile home after the notice of rescission constituted a use of the goods inconsistent with the seller's ownership and that therefore a new acceptance of the goods occurred.[9] The answer to this contention is that

[6] *Cf., Overland Bond & Investment Co. v. Howard,* 9 Ill App3d 348, 292 NE2d 168 (1972); *Campbell v. Pollack,* 101 R I 223, 221 A2d 615, 619 (1966).

[7] *See also, Lanners v. Whitney,* 247 Or 223, 428 P2d 398 (1967). Cases closely in point are *Minsel v. El Rancho Mobile Home Center, Inc.,* 32 Mich App 10, 188 NW2d 9 (1971); *Frontier Mobile Home Sales, Inc. v. Trigleth,* 505 SW2d 516 (Ark 1974); and *Pedrini v. Mid-City Trailer Depot, Inc.,* 1 Wash App 39, 459 P2d 76 (1969), a holding in which the purchaser of a mobile home successfully revoked acceptance despite the fact that he was able to live in the defectively constructed unit.

[8] *See, Overland Bond & Investment Co. v. Howard, supra* note 6; *Orange Motors of Coral Gables v. Dade County Dairies,* 258 So2d 319 (Fla App 1972).

[9] "(1) Acceptance of goods occurs when the buyer * * * (c) [d]oes any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him." ORS 72.6060(1)(c).

plaintiffs retained a security interest in the mobile home after the revocation of acceptance.[10] This entitled them to continue in possession[11] to preserve their collateral. Continued occupancy was the most feasible method of protecting the mobile home from water damage. The alternative was to find covered storage which would have been expensive.[12] Defendant suffered no loss as a result of plaintiffs' occupancy since the trial court awarded an offset to defendant for the rental value of the mobile home during plaintiffs' occupancy.

Plaintiffs having successfully revoked their acceptance of the mobile home, Pressnall thereby breached the warranty given on assignment of the financing contract to Commercial Credit. Damages were, therefore, properly awarded to Commercial Credit.

The decree of the trial court is affirmed.

---

[10] ORS 72.7110(3). "On rightful rejection or justifiable revocation of acceptance a buyer has a security interest in goods in his possession or control for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care and custody and may hold such goods and resell them in like manner as an aggrieved seller as provided in ORS 72.7060."

[11] ORS 79.2070(1) and (4): "(1) A secured party must use reasonable care in the custody and preservation of collateral in his possession. * * *

"(4) A secured party may use or operate the collateral for the purpose of preserving the collateral or its value * * *."

[12] *Cf., Chaplin v. Bessire & Co.*, 361 SW2d 293 (Ky 1962) indicating that the use of the goods may be proper under the doctrine of avoidable consequences.