**HEMMERT AGRICULTURAL AVIATION, INC., Plaintiff,**

v.

**MID-CONTINENT AIRCRAFT CORPORATION, Defendant.**

Civ. A. No. 85–6125–C.

United States District Court,
D. Kansas.

July 2, 1987.

Ronald S. Shalz, Shalz, Taylor, Schiffner & Kriss, Colby, Kan., and Darrell L. Warta, Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., for plaintiff.

Charles W. Harris, Curfman, Harris, Stallings & Snow, Wichita, Kan., for defendant.

## MEMORANDUM AND ORDER

WESLEY E. BROWN, Senior District Judge.

This is a diversity action wherein plaintiff seeks to revoke acceptance and to recover damages arising from its purchase of an agricultural spray plane from the defendant. After hearing the witnesses' testimony and counsels' arguments, examining the evidence and researching the law, the court makes the following findings of fact and conclusions of law as required by Fed.R.Civ.P. 52.

### FINDINGS OF FACT

1. Hemmert Agricultural Aviation, Inc. ("Hemmert Ag"), is a Kansas corporation engaged in the business of agricultural spraying, primarily commercial crop dusting and fertilizer application. Hemmert Ag generally operates within a forty mile radius of Oakley, Kansas, and its typical spray season runs from the first of May until the middle of September each year.

2. Mark Hemmert (Hemmert) is the President and sole stockholder of Hemmert Ag. He is presently 31 years old. He has fifteen years of general flying experience and approximately ten years of agricultural spraying experience. He personally does most of the flying for Hemmert Ag, but occasionally other pilots and planes are hired on a temporary basis.

3. Defendant, Mid-Continent Aircraft Corporation (Mid-Continent), is a Missouri corporation in Hayti, Missouri, engaged in the business of commercial crop dusting and aircraft sales. Mid-Continent is an authorized dealer of Ag-Cat spray planes. Ag-Cat spray planes were initially manufactured by Grumman, but the current manufacturer is Schweizer Aircraft Corporation.

4. Richard Reade is the President and principal stockholder of Mid-Continent.

5. In 1980, Hemmert purchased a 1977 used "B" model Schweizer Ag-Cat. This plane was the trade-in when the plane in issue was purchased. This 1977 "B" had a 300 gallon hopper and a larger tail and

vertical fin than the Model G–164B Ag-Cat 600 Super "B" plane (Super "B"), which is the plane in issue. The Super "B" had a 400 gallon hopper and a raised upper wing. From reading advertisements and talking with Reade, Hemmert believed the raised wing on the Super "B" made it faster and more maneuverable and improved visibility. Terrell Kirk, an engineer and test pilot with Schweizer, testified the raised wing was primarily for visibility purposes.

6. In 1984, Hemmert called Mid-Continent, as he was interested in trading in his 1977 "B" Ag Cat for a new and bigger plane, Super "B".

7. In August 1985, Hemmert again contacted Mid-Continent, in particular Richard Reade, about purchasing the Super "B". While satisfied with the performance of his 1977 "B" Ag Cat, he had been having a good year and wanted a plane that was faster to the field, more maneuverable and more productive. Hemmert's trade-in was in good condition other than needing some routine maintenance. Hemmert purchased the Super "B" believing it would make his work easier, safer and more profitable. Another reason for the timing of the purchase was that Hemmert hoped to take advantage of the investment tax credit.

8. Hemmert's belief that a Super "B" was more maneuverable than his 1977 Ag-Cat "B" was based in part on an advertisement for the 450 "B" (Plaintiff's Ex. 4), which stated in part: "New raised wing design means more maneuverability; more visibility; more speed." The 450 "B" described in defendant's Exhibit 38 differs from the Super "B" 600 hp. only in horsepower, hopper size, and length (4 inches). In fact, defendant's Exhibit 39, a Schweizer advertisement brochure stamped with defendant's name and address, explains the Super "B" is powered by either a 450 or 600 horsepower engine. The 450 "B" is identical to the 600 hp. Super "B" in almost all relevant respects, except for engine size and hopper capacity.

9. Hemmert testified that during the telephone conversation in early August 1985, Richard Reade represented the Super "B" to be faster, more maneuverable, and having better visibility than his 1977 Ag-Cat "B". Reade denied that these representations were made and stated that he only represented the Super "B" as more productive.

10. The parties struck their bargain over the telephone on August 6, 1985. Reade promised Hemmert that the Super "B" would be delivered in Oakley, Kansas, on or before August 9, 1985, and that the Super "B" would be ready to spray when it was delivered. Hemmert also believed the Super "B" would arrive equipped with aileron servos, an EGT gauge and a push-to-talk switch. The plane was sold to plaintiff for $128,000.00 total, $75,500.00 in cash plus Hemmert's trade-in. On August 6, 1985, Hemmert instructed the bank to wire the defendant the sum of $40,000.00.

11. The original engine that was in the Super "B" purchased by plaintiff was a 600 horsepower Pratt & Whitney engine overhauled by the Aero Company. This engine was replaced in Hayti, Missouri, with a Pratt & Whitney engine overhauled by the Thompson Company. Reade's notes on 8–5–85 show opposite the price, "Cat with Thompson eng." Mid-Continent discovered problems with the oil pressure in the Thompson engine. The Super "B" was flown from Hayti, Missouri, to Tulsa, Oklahoma, where the engine was repaired by the company that did the overhaul. Reade apprised Hemmert of the engine problems, and it was agreed the problems should be corrected before delivery.

12. After the repairs were made in Tulsa, Ed Zeeman, a ferry pilot, delivered the Super "B" to Hemmert Ag in Oakley, Kansas, on August 20, 1985. Zeeman arrived in Oakley late in the afternoon, and he was in a hurry to return that afternoon with plaintiff's trade-in.

13. Even though his bank was closed, by the time Zeeman arrived on August 20, 1985, Hemmert was able to get a cashier's check for $35,000.00 payable to Mid-Continent. Zeeman asked Hemmert to sign the purchase order and delivery receipt, which he did after looking over the plane. Zeeman left early the next morning around 5:30 A.M. Due to time and inclement

weather conditions, plaintiff was unable to try the plane before Zeeman's departure.

14. Hemmert merely glanced at the Purchase Order and Delivery Receipt before signing them. Immediately above Hemmert's signature the following printed language appears:

"The undersigned PURCHASER agrees that he has read and that he understands the provisions set out on the reverse side and that the same are included in and are a part of this Aircraft Purchase Order all as if fully set forth on the face hereof."

Toward the top of the purchase order, the following printed language is also found:

"The undersigned agrees to complete the contract and accept delivery as stated in the terms, conditions, warranty and limitations of liability printed on the reverse side of this order."

On the backside of the purchase order, the warranty provided by Schweizer Aircraft Corp. is set forth, following which it states:

"These warranty provisions are expressly in lieu of all other warranties, expressed, statutory or implied in fact or by law, including any implied warranty or merchantability or fitness for a particular purpose and of any obligation or liability on the part of Schweizer Aircraft, expressed or implied, or any nature whatsoever. Schweizer Aircraft neither assumes nor authorizes any other person or business organization to assume for it any other warranty or liability in connection with the sale, use or operation of its products."

15. The parties never discussed the warranty terms found on the back side of the purchase order prior to Hemmert's signature to the purchase order.

16. Prior to August 6, 1985, Hemmert had not flown the particular Super "B" he purchased nor flown any Super "B". Hemmert made no inquiries to other spray pilots who were using a Super "B". Reade acknowledged that it is not unusual for agricultural spray planes to be sold before the purchaser has actually flown them.

17. On August 20, 1985, the actual delivery date, Hemmert called Reade saying he was happy but that the aileron servos and EGT gauge were not on the aircraft. Reade's notes on this conversation reflect: "Said I didn't think he ordered, but if so, we'll back it up." Hemmert also indicated the absence of a push-to-talk switch. The push-to-talk switch was shipped to Hemmert on August 21, 1985. The EGT gauge was shipped on August 23, 1985. Since aileron servos were not kept in stock, Mid-Continent ordered them from Frakes Aviation and they were later shipped on September 9, 1985. Reade agreed not to charge for these additional options and to pay the cost for a mechanic in Oakley, Kansas, to install them. Hemmert never had these options installed even though they had arrived and Mid-Continent had agreed to pay the installation cost.

18. Around August 23, 1985, Hemmert flew the Super "B" with a small load of water in an effort to calibrate the spraying system. Hemmert noticed that the shutoff valve was not developing adequate "suck back" to shut off the flow of water. After his adjustments failed to correct the situation, Hemmert called Reade and told him the valve was defective. Read said a new valve would be sent and it could be installed at Mid-Continent's expense.

19. At about the same time, Hemmert complained about the performance of the Super "B". Hemmert noted that the plane was unresponsive in pitch, rolled excessively to the right, and lost air speed in turns, giving the pilot the sensation that the aircraft was "falling out from under him". Reade suggested the performance problems could be simply due to a bad engine. Hemmert said he was not satisfied and instructed Reade not to sell his trade-in. Reade represented that the trade-in had been sold. While the sale of the trade-in was not completed until September 6, 1985, at the time of Reade's representation to plaintiff there was an outstanding offer on the plane.

20. When the second spray valve arrived within a couple of days of August 23, 1985, plaintiff and an airport mechanic installed the second valve which also proved to be defective. When Hemmert called

Reade about the defective second valve, Reade said additional valves would be sent until an operative one was found.

21. Reade directed Dan Westbrook, a mechanic with Mid-Continent, to drive to Oakley, Kansas, and to replace the engine with the original Aero engine from the manufacturer. On or about August 26, 1985, Westbrook checked over the plane and replaced the engine. Westbrook then flew the plane empty for 30–40 minutes. Westbrook detected nothing glaringly wrong with the plane's flight characteristics. He believed the plane "flew well" and that it had a "personality of its own."

22. Still dissatisfied with the plane's flight characteristics, Hemmert contacted four other agricultural spray pilots and asked them to fly the Super "B". Each of these four spray pilots were highly experienced, but none had previously flown a Super "B". Each pilot flew the plane before Hemmert related any of his negative feelings regarding the plane. The four spray pilots were Jim Bussen of Sharon Springs, Kansas; Steven Kistler of Colby, Kansas; Kelly Henry of Augusta, Kansas; and Ken Bixeman of Colby, Kansas.

23. Bussen owned a Grumman Ag-Cat with a small fin. He test flew the Super "B" empty and it felt heavy and like it wanted to drop out beneath him. Bussen commented the Super "B" did not turn like his old Ag-Cat. He did not feel safe in the Super "B" and expected it to fly better. The Super "B" was then loaded with 200 gallons of water and Bussen flew it. He said it felt "scary" and that it did not climb like it should have. It took him twice the radius to make the turns and any steep turns caused the feeling of an imminent stall. He said the plaintiff's Super "B" flew "too much differently" to be termed just the personal characteristics of the plane.

24. Kistler flew the Super "B" once for 30–40 minutes with an empty hopper. Kistler's prior experience with Ag-Cats did not include the "big fin" B models. Kistler flew the plane making maneuvers similar to those in spraying a field. He never felt comfortable in the Super "B" as its power

drained on right turns. The Super "B" flew seriously different from other Ag-Cats, creating the sensation that it could stall any moment in a turn. He also testified that the Super "B"'s tail configuration resembled that of the "A" models which he had flown.

25. Bixeman and Henry experienced the same sensation of the plane's falling out from underneath them when they flew the Super "B". Henry testified that he had to make wider, easy turns with Super "B" which took extra time. At that point, Henry repeated the appropriate aphorism: "Time is money". Based upon the advertising literature that he had seen, Henry expected the Super "B" to be highly maneuverable.

26. Mark Hemmert also talked with Charles Dykes, an experienced agricultural spray pilot from Coy, Arkansas. He has fourteen Ag-Cat models including three Super "B"'s. Dykes has never seen nor flown plaintiff's Super "B". When Dykes got his first Super "B" he grew "sick of it", as it did not respond like any other Ag-Cat spray plane that he had owned or flown. At first, Dykes was very unhappy and was scared the first couple of times. After 40–50 hours flying, he started to become accustomed to the Super "B", and after 75 hours flying, he loved his Super "B". Dykes now uses his Super "B"'s to spray fields of much smaller acreages than the fields generally located in Western Kansas. Dykes told Hemmert to "stick with" the Super "B" and he would discover that it was a good plane.

27. Reade next arranged for Terrill Kirk, chief test pilot for Schweizer Company, to go to Oakley, Kansas, and check out plaintiff's Super "B". Kirk has an engineering degree and has flight tested twelve different models of Ag-Cats. He did all the flight testing necessary for type certification from the Federal Aviation Administration. Kirk has no experience as a commercial agricultural spray pilot. When Kirk arrived in Oakley, he first had Hemmert explain the flying characteristics of the Super "B". Kirk then checked several measurements on the plane. Kirk next

flew the plane empty, experiencing nothing unusual and finding it to be a "typical good Ag-Cat". The plane was then loaded with 270–280 gallons of water, and Kirk flew it, noting a tendency for the plane to roll into right hand turns. Kirk testified that this phenomenon could be called a stall, but that it was actually caused by pilot technique in using too much rudder. Kirk considered that technique to be a carryover from flying the big-fin "B" models like plaintiff's trade-in. Kirk thought plaintiff's Super "B" "handled good and flew well". Kirk then observed Hemmert flying the Super "B" and remarked that Hemmert made abrupt maneuvers and advised him to stop "cowboying" the plane and to try smoother turns. Kirk believed pilot technique for flying the Super "B" differs from that used on previous models.

28. Hemmert is dissatisfied with his Super "B" and has lost his confidence in it. Each pilot that testified at trial acknowledged that a spray pilot's confidence in his aircraft is very important. Because of a spray pilot's maneuvers close to the ground, his confidence is extremely essential.

29. In the Spring of 1986, Hemmert purchased another Ag-Cat, a 1982 600 horsepower "B" plus. This model did not have a raised wing design as found on the Super "B". Hemmert paid $78,000.00 for this plane and is still using it.

30. Hemmert was never satisfied with the Super "B". On October 30, 1985, Hemmert's attorney sent a certified letter notifying Mid-Continent of Mr. Hemmert's intent to revoke acceptance of the Super "B" under the Uniform Commercial Code. Reade admitted the plaintiff's complaints in that letter were not new to him.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and has subject matter jurisdiction pursuant to 28 U.S.C. Sec. 1332 by reason of diversity of citizenship and the requisite amount in controversy.

2. The parties have stipulated that the law of Kansas is to be applied. This is a sale of goods governed by the Kansas Uniform Commercial Code, K.S.A. 84–2–102, *et seq.* At the end of trial, the court took under advisement a number of evidentiary objections made by plaintiff in correspondence dated March 26, 1987, and defendant's response by correspondence dated April 1, 1987. The court overrules plaintiff's objections to defendant's Exhibits D4, D22, D23, D38, D39, D46, D48 through D53, D56 and D67. Plaintiff's objections are sustained as to Exhibits D26, D27, and D28 on grounds of relevance. Defendant withdrew Exhibits D17 and D37.

3. Plaintiff seeks to employ the remedy of revocation of acceptance set forth at K.S.A. 84–2–608:

(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

(b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

To revoke acceptance is to refuse the delivered goods after they have been accepted and after the time for their rejection has run. *Johnson v. General Motors Corp.,* 233 Kan. 1044, 1046, 688 P.2d 139 (1983). While a buyer may nominally reject for any defect, acceptance cannot be revoked absent a substantial nonconformity. The purpose of this remedy is to restore the buyer to the economic status quo which would have been enjoyed if the goods had not been delivered. *Id.* at 1051, 688 P.2d 139.

4. *Notice.* K.S.A. 84–2–608(2) (hereinafter 2–608) requires revocation to occur within a reasonable time after the buyer discovers or should have discovered the grounds for it. What is a reasonable time is obviously a function of circumstances. Typically, the notice of revocation will be given after the general notice of breach required under K.S.A. 84–2–607(3)(a), as the purchaser's wish to revoke is frequently the last resort after the seller's attempts to cure have failed. Because one purpose behind the notice provisions is to allow the seller the chance to cure, the outer limits of the reasonable time period should be flexible to encourage both the buyer and seller to cooperate in an effort to cure. See *Murray v. Holiday Rambler, Inc.*, 83 Wis.2d 406, 265 N.W.2d 513, 24 U.C.C.Rep. 52, 67–68 (1978); Official Comment 4 to 2–608. Similarly, if the seller continuously assures the buyer that the defects will be remedied, the notice period should be accordingly suspended.

Plaintiff gave notice of revocation within a reasonable time. Plaintiff properly relied on defendant's assurances that any defects would be corrected, and on defendant's subsequent efforts to cure. Hemmert promptly discovered the defects and immediately advised Reade of his complaints.

5. *Elements of Revocation Remedy.* Under 2–608, the buyer has the burden to prove:

> (1) the nonconformity of the machine to the needs and circumstances of the purchaser when purchase was made; (2) that such nonconformity in fact substantially impaired the value of the machine to the purchaser, and (3) that the purchaser accepted the machine under circumstances which bring him within either paragraph (1)(a), reasonable assumption of cure, or paragraph (1)(b), difficulty of discovery.

*Newmaster v. Southeast Equipment, Inc.*, 231 Kan. 466, 468, 646 P.2d 488 (1982). See *Black v. Don Schmid Motor, Inc.*, 232 Kan. 458, 462, 657 P.2d 517 (1983); *McGilbray v. Scholfield Winnebago, Inc.*, 221 Kan. 605, Syl. Para. 1, 561 P.2d 832 (1977).

As discussed more fully later in this order, the primary issue in this case is whether a substantial impairment exists when the plane's handling characteristics create fear and apprehension in the pilot for the first 50 hours of flying during the execution of maneuvers considered normal for other models of Ag-Cat planes. Substantial impairment is not defined in the Uniform Commercial Code. What constitutes a substantial impairment is considered to be a common sense determination. *Black,* 232 Kan. at 466, 657 P.2d 517. Kansas courts have followed the interpretation of other courts and have given substantial impairment both a subjective and an objective element. In *McGilbray,* the Kansas Supreme Court adopted the two-step inquiry found in *Jorgensen v. Pressnall,* 274 Ore. 285, 545 P.2d 1382, 1384–1385 (1976), which is:

> Since ORS 72.6080(1) provides that the buyer may revoke acceptance of goods 'whose nonconformity substantially impairs its value *to him,*' the value of conforming goods *to the plaintiff* must first be determined. This is a subjective question in the sense that it calls for a consideration of the needs and circumstances of the plaintiff who seeks to revoke; not the needs and circumstances of an average buyer. The second inquiry is whether the nonconformity in fact substantially impairs the value of the goods to the buyer, having in mind his particular needs. This is an objective question in the sense that it calls for evidence of something more than plaintiff's assertion that the nonconformity impaired the value to him; it requires evidence from which it can be inferred that plaintiff's needs were not met because of the nonconformity. In short, the nonconformity must *substantially* impair the value of the goods to the plaintiff buyer. The existence of substantial impairment depends upon the facts and circumstances in each case. (Emphasis in original.)

221 Kan. at 609, 561 P.2d 832, quoting *Jorgensen,* 545 P.2d at 1384–1385. The factfinder determines from the evidence the questions of nonconformity, the needs and circumstances of a purchaser, and im-

pairment of value to a purchaser. Leading commentators have noted:

> The only element of objectivity the *Jorgensen* court required was evidence from which it could be inferred that the buyer's needs were not met because of the nonconformity; that evidence must be something more than the buyer's mere assertion of substantial impairment. The language of cases like *Jorgensen*, coupled with the subjective phrase "to him" in Section 2–608 and official Comment 2 to that section, gives an aggrieved buyer a strong argument that he has the right to revoke acceptance because of his special sensitivity to the breach of warranty, even though the defects would be considered insubstantial to the average buyer.

Clark and Smith, *The Law of Product Warranties,* Para. 7.03(3)(a) (1984). While the evidence in this case establishes that not just Hemmert experienced discomfort and fear from the handling characteristics of the Super "B", if Hemmert's sensitivity to the Super "B" had been unique and there had been objective evidence that his needs were not met, revocation would still be consistent with the purpose and interpretation of 2–608. In considering the subjective element, the courts have employed a term, "shaken faith." In determining whether value was substantially impaired, the courts have weighed the cost of repairs, the inconvenience resulting from the nonconformities, and the entire impact the defects had on the buyer's confidence in the goods purchased. Wallach, *Buyer's Remedies,* 20 Washburn L.J. 20, 34 (1980). Lost confidence has been adopted by a number of courts and labelled as the "shaken faith" doctrine. Where the buyer's confidence in the dependability of the machine is shaken because of the defects and possibly because of seller's ineffective attempts to cure, revocation appears justified. See *Lathrop v. Tyrrell,* 128 Ill.App.3d 1067, 84 Ill.Dec. 283, 471 N.E.2d 1049, 39 UCC Rep. 1653 (1984); *Haverlah v. Memphis Aviation, Inc.,* 674 S.W.2d 297, 40 U.C.C.Rep. 1263 (Tenn.Ct.App.1984).

Kansas appellate courts have not specifically addressed whether a buyer's lost confidence is a relevant factor for determining substantial impairment. In summarizing the recurring defects with the pickup in *Johnson v. General Motors Corp.,* 233 Kan. at 1045, 688 P.2d 139, the Kansas Supreme Court concluded: "(r)epairs were attempted under GMC's warranty agreement but the Johnsons had lost confidence in the truck." While only dicta, this is an indication that Kansas courts would recognize this doctrine to be an appropriate factor within the subjective element of substantial impairment and a necessary companion in concept to the seller's right to cure. This court considers the buyer's lost confidence in a product to be a relevant consideration in determining a substantial impairment in value.

6. *Nonconformities.* A nonconformity includes breaches of warranties (implied and express) as well as any failure of the seller to perform pursuant to his contractual obligation. *Black,* 232 Kan. at 466, 657 P.2d 517.

An express warranty is created by any representation of fact or promise that relates to the goods and becomes a basis of the bargain. K.S.A. 84–2–313; *Cricket Alley Corp. v. Data Terminal Systems, Inc.,* 240 Kan. 661, 665, 732 P.2d 719 (1987). Advertising may form a part of an express warranty. *Transamerica Oil Corp. v. Lynes, Inc.,* 723 F.2d 758, 762 (10th Cir. 1983). The advertisement for the 450 "B", admitted as plaintiff's Exhibit No. 4, closely relates to the plane purchased by plaintiff and was relied upon by plaintiff in his decision to purchase the Super "B". Plaintiff reasonably inferred that the advertising representations for the 450 "B" were applicable to the 600 horsepower version that he purchased. The court finds an express warranty that the Super "B", because of the raised wing design, was more maneuverable and offered better visibility and more speed.

In light of that advertisement and plaintiff's reliance on the same, the court believes that Hemmert did ask Reade if the Super "B" was more maneuverable and faster and that Reade made some representations that assured Hemmert in a reason-

able manner that these qualities existed. Defendant expressly warranted that the Super "B" was more maneuverable and faster than former models of Ag-Cat spray planes.

An implied warranty of merchantability is created in K.S.A. 84-2-314, which provides that if the seller is a merchant with respect to goods of the kind sold, then a warranty that the goods shall be merchantable is implied in the contract for sale. To be merchantable, the goods must at least pass without objection in the trade under the contract description and must be fit for the ordinary purposes for which such goods are used. *Dale v. King Lincoln Mercury, Inc.*, 234 Kan. 840, 842, 676 P.2d 744 (1984).

7. Plaintiff has sustained its burden in establishing nonconformities. The handling characteristics which created fear and apprehension in plaintiff and other experienced spray pilots were directly contrary to express representations of maneuverability and speed. There being no question that Mid-Continent is a merchant as defined at K.S.A. 84-2-104(1), the Super "B" is in breach of the implied warranty of merchantability. Plaintiff has proven that the Super "B" it purchased cannot pass without objection to its handling characteristics in normal turning maneuvers in spraying fields. In a trade as hazardous as crop dusting, a pilot would not reasonably accept without objection a plane that takes some 50 hours of flight time before the pilot's unusual fears and concerns about the particular plane are allayed. This conclusion is particularly appropriate where neither the seller nor manufacturer cautions the purchaser that the particular model handles significantly different from other Ag-Cats.

8. *Warranty Disclaimer.* The court believes the holding and analysis in *Transamerica Oil Corp. v. Lynes, Inc.*, 723 F.2d at 762-63, is on all fours with the present case. The parties did not intend the purchase order to be the final expression of their agreement. The plaintiff's order was taken over the telephone, and the parties never signed a negotiated document. This form purchase order is easily susceptible to interpretation as a billing statement rather than a fully integrated contract, the printed language toward the top providing: "The undersigned agrees to complete the contract and accept delivery as stated in the terms, conditions, warranty and limitations of liability printed on the reverse side of this order." This document creates the impression that it serves as acknowledgement of receipt and that the terms of the contract can be found elsewhere. This case is one where unexpected and unbargained for disclaimers appear in a printed form prepared by the seller. *Transamerica*, 723 F.2d at 763. Utilizing K.S.A. 84-2-316(1), the court concludes that the disclaimers found on the back of the printed purchase order form are not effective in disclaiming the express warranties created by the advertisements and oral representations. See *Transamerica*, 723 F.2d at 762-63.

As to the disclaimer of implied warranties, the court also follows the reasoning found in *Christopher & Son v. Kansas Paint & Color Co.*, 215 Kan. 185, 523 P.2d 709, *modified on other grounds*, 215 Kan. 510, 525 P.2d 626 (1974), and *Van Den Broeke v. Bellanca Aircraft Corp.*, 576 F.2d 582 (5th Circ.1978). In these decisions, the courts held that the contract had existed or the bargain was made as of the telephone conversation and that the buyer never later negotiated or bargained for the disclaimer found on the back of the purchase order. Since these holdings are indistinguishable from the facts in the present case, the court concludes the implied warranty of merchantability was not effectively disclaimed by defendant.

9. *Substantial Impairment.* The relevant law regarding this question has been previously discussed. Plaintiff has proven a substantial impairment. His lost confidence in the Super "B" caused by its handling characteristics, which scare experienced pilots in making normal spraying maneuvers, amounts to a substantial impairment. A spray pilot's activities are considered dangerous in flying at very low altitudes and quickly maneuvering to apply sprays and to avoid obstacles. Undeniably,

a spray pilot's confidence in his plane is absolutely crucial. Mr. Dykes' endurance of his "unhappiness" and fear for the first fifty hours of flying the Super "B" does not mean that the same fears and dissatisfaction experienced by Hemmert are not a substantial impairment of value. A pilot's confidence and willingness to undertake dangerous spraying maneuvers in a plane is reasonably destroyed when the pilot consistently experiences the sensation that the plane is about to "fall out from under him" when making normal spraying turns. Similarly, it is unreasonable to expect someone to endure his fears and otherwise operate the plane in his normal spraying business for those fifty hours. A seller's subsequent assurance that the buyer need only modify his flying technique and the sensations will no longer occur is understandably ineffective in rekindling a purchaser's confidence in a plane that he believed would be more maneuverable and faster. These nonconformities substantially impair the value of the Super "B" to plaintiff. The testimony of the four spray pilots and Dykes is evidence other than plaintiff's assertion which sustains an inference that plaintiff's needs are not met by the Super "B".

10. *Acceptance under 2–608.* Another requirement is that the purchaser accepted the goods on the reasonable assumption that the nonconformities would be cured, or without discovery of the nonconformities as induced by the difficulty of discovery or seller's assurances.

Hemmert's discovery of the Super "B" 's handling characteristics was postponed until after acceptance because of the timing of delivery and weather conditions. The court does not consider the absence of the aileron servos, EGT gauge, and push-to-talk switch nor the defective spray valve to be nonconformities. Defendant has effectively and timely cured by supplying these parts and replacements. Consequently, these alleged defects do not constitute nonconformities under the terms of 2–608. See *McGilbray,* 221 Kan. at 610–611, 561 P.2d 832; and *Black,* 232 Kan. at 465, 675 P.2d 517.

11. *Remedy.* When a buyer rightfully revokes his acceptance, he may recover pursuant to K.S.A. 84–2–711 a refund of the purchase price paid and incidental and consequential damages, which may include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods and any other commercially reasonable charge or expense in effecting cover or caused by delay or other breach. The buyer is also entitled to prejudgment interest from the date that revocation is attempted. *Johnson,* 233 Kan. at 1054, 688 P.2d 139.

IT IS THEREFORE ORDERED that judgment is entered in favor of plaintiff and against defendant, and defendant is herein ordered to pay plaintiff the sum of $159,314.14, which are those damages set forth in plaintiff's exhibit 10 modifying the prejudgment interest to commence on September 30, 1985. Upon payment of the entire judgment, plaintiff shall make the Super "B" available upon one week's notice for defendant to pick up the Super "B" at the plaintiff's place of business in Oakley, Kansas.

IT IS FURTHER ORDERED that the Clerk of the Court shall enter judgment reflecting the same.